George **RAMSEY** et al., Plaintiffs-
Appellants,

v.

The **UNITED MINE WORKERS OF
AMERICA**, Defendant-Appellee.

**TENNESSEE PRODUCTS AND CHEM-
ICAL CORPORATION**, Plaintiff-
Appellant,

v.

The **UNITED MINE WORKERS OF
AMERICA**, Defendant-Appellee.

Nos. 72–1926, 72–1927.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 2, 1973.

Decided June 19, 1973.

———◆———

John A. Rowntree, Knoxville, Tenn., William M. Ables, Jr., South Pittsburg, Tenn., for plaintiffs-appellants; Clarence E. Walker, Chattanooga, Tenn., A. Allan Kelly, South Pittsburg, Tenn., Dick L. Lansden, Nashville, Tenn., Vivienne W. Nearing, New York City, N. Y., on brief.

Harrison Combs, Washington, D. C., for defendant-appellee; Edward L. Carey, Williard P. Owens, Washington, D. C., E. H. Rayson, Knoxville, Tenn., M. E. Boiarsky, Charleston, W. Va., on brief.

Before WEICK, EDWARDS and KENT,* Circuit Judges.

EDWARDS, Circuit Judge.

This is the second time these two cases have been before this court on the merits. On the first occasion our court, sitting en banc, divided four to four on the question as to whether or not the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.* (1970), demanded application of the "clear proof" standard in determining whether defendants were guilty of a conspiracy to violate the antitrust laws (15 U.S.C. §§ 1, 2 (1970)). Ramsey v. UMW, 416 F.2d 655 (6th Cir. 1969). This division affirmed the District Judge, who had held that the clear proof standard was applicable and that plaintiffs had failed to prove their case. Ramsey v. UMW, 265 F.Supp. 388 (E. D.Tenn.1967).

On grant of certiorari the United States Supreme Court divided five to four and reversed. Justice White and four other Justices held that the clear proof standard (See Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106 (1970)) did not apply generally in an antitrust case against a labor union. The Supreme Court held that the clear proof standard applied only to the question of whether or not the defendant union had participated in, authorized, or ratified the acts claimed to constitute the antitrust violation. The Supreme Court also held that the preponderance of the evidence test would apply regarding the defendant's guilt on the alleged anti-trust conspiracy. The case was then remanded to this court for remand to the District Court for reconsideration under the standard as newly defined. Ramsey v. UMW, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971).

' The District Judge in the first *Ramsey* case had held that there was neither an actual nor an implied conspiracy between the UMW and large mine owners under the clear proof standard. However, the District Judge also said:

> Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U.M.W. did so impliedly agree. Ramsey v. UMW, 265 F.Supp. 388, 412 (E.D.Tenn. 1967).

---

* Judge Kent participated in the decision in this case and concurred in this opinion and the opinion was in the hands of the printer prior to Judge Kent's death on

May 28, 1973. The procedural decision involved in this footnote is concurred in by Judge Weick who dissents on the merits. See p. 755.

When the District Judge reconsidered the entire record in the instant second *Ramsey* case (referring to the language just quoted above), he entered the following findings. They are the critical findings we must now review in this appeal:

"As appears from the opinion, this conclusion was stated by the Court in connection with the discussion of the PWC and at a time when the Court was in fact weighing the evidence under the clear proof rule and not under the preponderance rule. It is accordingly proper that the Court should reconsider its previously stated conclusion with a view to determining whether it is justified when the evidence is carefully considered in light of the preponderance standard of proof. Such a reconsideration is further required by an apparently conflicting conclusion arrived at by the Court in the concluding portion of its former opinion wherein the Court stated:

'While many inferences favorable to the plaintiffs' contentions can reasonably be drawn from the evidence, in every instance a no less equally reasonable inference can be drawn to the contrary. The latter, when coupled with the positive denial of many witnesses of any conspiracy, as well as other inferences favorable only to the defendant's contentions, do not permit a finding based upon clear proof of an antitrust conspiracy.' (265 F.Supp. 388 at 432)

Apart from the plaintiff's contentions regarding the Protective Wage Clause and as hereinabove considered, there is no direct evidence in the record of a conspiratorial agreement between the UMW and the BCOA.* As reflected by the record, every witness having personal knowledge of the negotiations and dealings between the UMW and the BCOA denied the existence of any agreement, secret or otherwise, wherein the Union conspired or committed itself to impose the wage and labor standards negotiated with the BCOA upon coal operators who were not members of the BCOA or who were not signatories to the contract negotiated with the BCOA. Making this denial were every officer and representative of the Union and every officer and representative of the BCOA who testified at the trial. Among the evidence now sought to be newly offered by the plaintiffs is the testimony of Mr. Moody. Even Mr. Moody, who as President of the Southern Coal Operators Association from 1946 to 1960 represented competitors of the BCOA in negotiations with the UMW, vehemently denies any such conspiracy. The statement in its former opinion that: 'Every officer of the Union who testified, as well as every representative from the Coal Industry alleged to be in on the conspiracy, denied its existence.' (265 F Supp. 388 at 432) remains a correct statement.

Accordingly, if a conspiracy is to be found, it must be found in the reasonable inferences to be drawn from proven facts. That is, it must be inferred from the evidence.

The Court in its former opinion considered the various inferences that might be drawn from the various facts proven in the case. For example, the circumstances leading up to the 1950 National Contract and the changes that occurred at that time in the negotiating pattern followed by the Union are believed to be fully and correctly stated in the Court's previous opinion. The plaintiffs both then and now would have the Court infer from this evidence the beginning of an anticompetitive conspiracy between the Union and the major coal operators. The Court, however, has previously concluded:

'The Court can only say that upon the evidence to this point, it can discern no evidence of an incipient Sherman Act conspiracy. Certainly the testimony of the principal negotiators for both the Union and the operators is emphatic to the contrary. To conclude inferentially otherwise on the

---

* Bituminous Coal Operators Associaton (BCOA).

basis of the wage scale negotiated is to engage in unwarranted speculation and is to disregard the undeniable right of the Union to seek to gear its wage scale to the ability to pay of the soundly solvent and not the marginal producer . . . The circumstances of the negotiations as outlined above give no support in reason to such a conspiratorial inference. Rather, quite to the contrary.' (265 F.Supp. 388 at 406 and 407).

Having now reconsidered the record under the preponderance rule, the Court can see no reason for altering these findings or conclusions.

Likewise, after recounting the evidence regarding the formation of the BCOA, the collective bargaining that occurred between 1950 and 1958 and the changes that occurred in the industry in these years, including the move to mechanization, the Court had these things to say:

'That these more peaceful procedures suggest a Sherman Act conspiracy, however, is not reasonably to be inferred . . . The economic pressure created by technological advances and the competition engendered thereby do not equate to a Sherman Act violation . . . The Court being unable to infer any Sherman Act conspiracy from the record to this point, these matters must accordingly be considered subsequently in the light of the total record.' (265 F.Supp. 388 at 408, 409 and 410).

Again, having reconsidered the record under the preponderance rule, the Court can see no reason for altering these findings or conclusions.

Passing for the moment the former discussion of the Protective Wage Clause and turning to the evidence regarding the UMW's investments in the West Kentucky Coal Company and the activities of that coal company upon the TVA market, the Court again finds its former statement of the facts to be in accord with the record when viewed in the light of the preponderance rule. The Court there stated:

'The Court concludes that the evidence fails to establish that West Kentucky Coal Company or its subsidiary, Nashville Coal Company, engaged in predatory pricing of coal upon the TVA market. It rather appears that West Kentucky and Nashville based their prices upon legitimate business considerations and were attempting at all times to meet the competition, rather than lead the market downward. Having so concluded, it becomes unnecessary to consider further the responsibility of the U.M.W., if any, for West Kentucky and Nashville's coal pricing policies.' (265 F. Supp. 388 at 422)

Likewise, the Court has again reviewed the record and its former findings as they relate to the Southeastern Tennessee coal field and the actions of the UMW regarding the plaintiffs in that coal field. After reciting the facts, the Court concluded:

'Upon this record the U.M.W. could not be held chargeable for the violence, even were the standard of proof required that of a usual civil case. . . . Clear proof does not appear, either directly or by inference, that the U.M.W. acted other than unilaterally in furtherance of its own interests and purposes in its activities in the Southeastern Tennessee coal field in the period here under review.' (265 F.Supp. 388 at 429–430)

The former statement of facts is believed upon review to be correct. Although the conclusion reached was weighed upon the clear proof scale, upon reweighing upon the preponderance scale the Court now arrives at the same conclusions.

There remains to consider the inferences to be drawn from the PWC as well as the inferences to be drawn when considering the record as a whole rather than in its component parts.

As previously found, the PWC did not by its terms commit the UMW to impose the wage and labor standard negotiated with the BCOA upon other coal operators with whom it might deal in the future. Did it by implication do that which it has been found not to have expressly done? Wherein does the evidence preponderate on this issue?

In its original opinion the Court in what it deemed to be dictum concluded that the preponderance rule would favor an inference that the PWC did by implication what it had not expressly done. The Court was motivated to such a finding by three considerations. One consideration was that thereafter the UMW did in fact negotiate contracts only upon the wage and labor standards set in the National Contract. Another consideration was that BCOA and its members did have a competitive motive, as evidenced by the PWC itself and its administration, to seek such a result. A third consideration was that complaints were in fact registered with UMW by signatory operators from time to time regarding the competitive advantage of non-signatory operators.

While each of these considerations remain persuasive with the Court, a careful review of the record would reveal other conflicting but equally persuasive considerations. While it is true that the UMW negotiated only upon the basis of the National Contract after the PWC was placed in the contract in 1958, it is also true that long prior to 1958, in fact ever since 1941, the Union had negotiated all contracts on the same flat across-the-board wage increases. Although wage differentials between northern and southern operators had been negotiated prior to 1941, it was the stated purpose of the Union from its inception to establish uniform wage and labor standards. As previously noted by the Court, "It appears clear from the evidence that national uniformity in wage rates and labor standards in the coal industry has been a consistent policy and goal of the UMW since its inception in 1890." 265 F.Supp. 388 at 404. A union is always in competition with non-union labor. It is apparent that the wage differentials negotiated prior to 1941 had the effect of placing the Union in competition with itself and that the Union sought consistently to avoid or eliminate these differentials.

As regards any inference to be drawn from a competitive motive on the part of BCOA, upon further reflection it is apparent that in a competitive economy a competitive motive will be universal to all coal producers. To draw an inference of antitrust conspiracy from this motive would be somewhat of an anomaly.

Finally, as regards the inference to be drawn from the registering of complaints of competitive disadvantage with the UMW by contract signatories, it is apparent that complaints of coal operators of competitive disadvantage were universal in their origin and included the plaintiffs themselves. Perhaps one operator best summed up the attitudes of all operators when at a bargaining session he stated: 'All I want is a fair advantage.' Collective bargaining inevitably involves the discussion of the competitive effect of wage and labor standards.

Although at the time the Court was weighing the inferences to be drawn from the PWC under the clear proof test it indicated a different result might follow were the preponderance rule to be applied, it is apparent upon careful review that the inferences to be drawn from the PWC are as consistent with unilateral action as they are with conspiratorial action and leave the Court to speculate in making the choice. Where equal inferences can be drawn and the Court is left to speculate, the plaintiffs have failed to carry their burden of proof. South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767 (6th Cir., 1970)." Ramsey v. UMW, 344 F.Supp. 1029, 1035–1038 (E.D.Tenn.1972).

We have indulged this lengthy quotation from the District Judge's opinion in the second *Ramsey* case after his review

of the record on remand from the United States Supreme Court because it sets out his point of view on two of the three major issues of this appeal which we state below as we see them:

I. Was the District Judge on this review of the evidence on remand bound by his previous statement that if he were trying the case under the preponderance of the evidence rule, he would conclude that the UMW had impliedly entered a conspiracy?

II. Are the District Judge's findings of fact, after review of the record on remand as set out above, clearly erroneous under Fed.R.Civ.P. 52(a)?

III. Did the District Judge commit reversible error by failing to receive in the record the additional exhibits and depositions tendered by plaintiffs-appellants on their motion for opening the record for additional evidence?

### I. The Law of the Case Question

■ Of course, if the District Judge's comment in first *Ramsey* was as appellants now argue "the law of the case," this would end the matter and we would not need to answer any other questions. Significantly, however, if it had been, the United States Supreme Court would not have needed to remand this case for the District Judge for reconsideration under the preponderance of evidence standard and in the light of the Supreme Court opinion.

In first *Ramsey*, in the Supreme Court the appellant companies sought reversal and remand "with direction that UMW be adjudged in violation of" the Sherman Act, and that a new trial be granted "for the determination of damages . . . or in the alternative that" appellants "be granted a new trial." It is, however, clear to us that the Supreme Court granted neither of these forms of relief. As previously noted, the Supreme Court's majority opinion held that the clear proof standard had been erroneously applied below in first *Ramsey* and that the existence of an antitrust conspiracy must be rede-

termined by normal preponderance of proof standards. It remanded, noting at one point, "To what extent the proof would fail under the standard we here hold applicable and what legal difference it might make are matters open to be dealt with on remand." Ramsey v. UMW, 401 U.S. 302, 308 n.5, 91 S.Ct. 658, 662, 28 L.Ed.2d 64 (1971). Thus we believe that the Supreme Court clearly did not view the first *Ramsey* preponderance of evidence comment by the District Judge as "the law of the case" as appellants now contend.

Additionally, and for the reasons which we have quoted from the District Judge in his opinion in second *Ramsey*, we hold that the comment was dictum and appropriately subject to the District Judge's reconsideration on the total record when the case had been remanded to him.

### II. Are the District Judge's Findings "Clearly Erroneous"?

■ As to the principal issue in this case, on review of this total record, this court finds that it cannot hold that the District Judge's findings of fact on the antitrust conspiracy issue are clearly erroneous. Rule 52(a) of the Federal Rules of Civil Procedure provides:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. Fed.R.Civ.P. 52(a).

Thus, however we might individually view the evidence if we were the triers of fact, it is clear that we are required to give great weight to the findings of the trial court which had the opportunity to see the witnesses, to weigh their evidence as it was presented, to view the demeanor of the persons who testified in court, and to determine all issues of credibility.

The testimonial record which we now review is, of course, identical with that which this court reviewed prior to its decision of the first *Ramsey* case. In

the opinion in this court which affirmed the District Judge by equally divided vote, we said:

"The essence of appellants' evidence of conspiracy to drive BCOA's competitors out of business consisted of 1) evidence of UMW attempts to organize the Southeastern Tennessee coalfields, including the operations of appellants; 2) the claimed violent and disastrous economic impact of these activities, and 3) the purchase of substantial stock in the West Kentucky Coal Co. by the UMW and the subsequent 'price cutting' activities of West Kentucky Coal which appellants assert served to drive Southeastern Tennessee coal out of the TVA market.

The District Judge's analysis of the evidence he heard is masterly. His opinion covers 52 pages of volume 265 of Federal Supplement and while we affirm it for purposes of our decision on the facts, in view of its ready availability we shall quote from it selectively.

Briefly put, the District Judge found in essence that 1) the UMW in its organizing activities in the Southeastern Tennessee coalfields was pursuing its own and its own members' interests rather than those of the BCOA; 2) appellants' economic troubles stemmed as much (or more) from the geological structures of the Southeastern Tennessee coalfields which made mechanization of the mines to meet oil, gas and electrical competition difficult and from undercapitalization and bad management as they did from the activities of the UMW, and 3) that the total record did not support the charge that defendant conspired with West Kentucky Coal so as to engage in predatory price cutting in the TVA market.[3]

The District Judge's findings on these issues included:

1) '[P]icketing and violence are not per se evidence of a Sherman Act conspiracy. Thus the strike, ratified by the U.M.W., and picketing, to the extent that it received U.M.W. approval, and not the violence unconnected upon the record with the U.M.W., may be looked to as they may or may not demonstrate the purpose of the U.M.W. to conspire with others to impose the National Bituminous Coal Wage Agreement upon the Southeastern Tennessee coal field. The record in this regard fails to show any direct evidence of a Sherman Act conspiracy. Whether such an inference can be drawn must depend upon a review of all of the evidence upon the present phase of the case, to be followed by a review of all of the evidence upon all phases of the case.

'Upon review of the evidence as it relates to the Southeastern Tennessee coal field and of the U.M.W.'s activities therein, the following conclusions appear to be clearly supported by the evidence:

'(1) To operate successfully the producers in the Southeastern Tennessee coal field must be able to compete and survive on the T.V.A. coal market. Since 1954 50% or more of all coal produced in the State of Tennessee has had to find its market with the T.V.A. That figure reached as high as 78% in 1956 and by 1962 was still at 64.3%.

'(2) Due to the geological conditions, the Southeastern Tennessee coal fields cannot achieve a level of productivity equivalent to that of its principal competitors on the T.V.A. coal market. This competitive disadvantage is offset in part by the transportation and quality advantages which the field has over

3. We note here that West Kentucky Coal Company was not a defendant in this antitrust conspiracy case as of the time of trial. A stipulation to dismiss it as a defendant had been entered into by plaintiffs. This left the UMW as the only target of this suit alleging an antitrust conspiracy to drive the BCOA's competition out of business. While this fact alone does not justify dismissal of the suit against the UMW, it does seem to cast doubt upon the good faith of the predatory intent aspect of plaintiff's case.

its principal competitors in the T.V.A. market at the Widow's Creek steam plant.

'(3) In the period since 1960 the coal operators in the Southeastern Tennessee coal field have been unable to compete and survive in the T.V.A. coal market under the National Bituminous Coal Wage Agreement. While in many instances this appears to have been due to antiquated mining methods and equipment or other causes, the fact nevertheless remains that since 1960 there has not been a single instance of a successful coal mining operation in the Southeastern Tennessee coal field under the National Bituminous Coal Wage Agreement and this in spite of the fact that the only feasible alternative facing most coal operators in the area was to operate under the national contract or go out of business.

'Further than this the Court cannot go. Clear proof does not appear, either directly or by inference, that the U.M.W. acted other than unilaterally in furtherance of its own interests and purposes in its activities in the Southeastern Tennessee coal field in the period here under review. In this regard the plaintiffs rely upon the defendant's advocacy of mechanization as a solution to the operators' competitive difficulties as one element of proof demonstrating a conspiracy, in that the U.M.W. was in fact attempting to force mechanization upon a coal field which it knew to be unsuited by geology therefor and at a rate that the U.M.W. knew was impossible for all but the largest coal operators in the nation. This contention does not appear to accord with the evidence. In the first place, it does not appear that mechanization would be ineffective in rendering the Southeastern Tennessee coal field competitive. Both Allen & Garcia and Grundy Mining Company appear to have been well on the way toward raising productivity to competitive levels by mechanization when their efforts were thwarted or halted by seniority and

strike difficulties. In the second place, it does not appear that mechanization is beyond the economic capacity of all but the larger producers on the national scene.' Ramsey v. United Mine Workers of America, 265 F.Supp. 388, 430 (E.D.Tenn.1967).

\* \* \* \* \* \*

'Reviewing the evidence as a whole in this light, the Court is unable to find that the evidence clearly reflects that the plaintiffs were the victims of any conspiracy between the U.M.W. and any coal operators or other non-labor organization to eliminate or suppress competition in the coal industry or to eliminate or suppress the production and sale of coal by the plaintiffs. While many inferences favorable to the plaintiffs' contentions can reasonably be drawn from the evidence, in every instance a no less equally reasonable inference can be drawn to the contrary. The latter, when coupled with the positive denial by many witnesses of any conspiracy, as well as other inferences favorable only to the defendant's contentions, do not permit a finding based upon clear proof of an antitrust conspiracy.' 265 F.Supp., *supra* at 432.

2) 'The seam of coal in the Southeastern Tennessee coal field, called the Sewanee seam, is located in a mountainous area of the State at an elevation of approximately 1800 feet. It is a rather high grade metallurgical coal. That is, it is usable for making coke for metallurgical purposes. However, the field has certain geological disadvantages. The principal of these is the thinness of the seam. The average thickness of the Sewanee seam appears to vary from 36 to 42 inches, but the seam is highly irregular in this respect. The seam is subject to squeezes and rolls in a very irregular and unpredictable manner; that is, the thickness of the seam varies and these conditions have no pattern. The seam may in one place be squeezed to a matter of a few inches in thickness or may be entirely pinched out by rock.

In other places the coal may be rolled into a thickness up to six feet. Hazardous roof conditions are often encountered, especially in the areas of the rolls. The topography of the area is largely mountainous. Accordingly, most mining must be done underground, and the field does not lend itself to strip mining due to excessive overburden except in limited areas.

'These geological conditions place the Southeastern Tennessee coal field at a disadvantage with many other coal fields. For example, whereas only 32% of the coal produced in Tennessee is produced from seams over four feet thick, 65% of the coal comes from seams over four feet thick in the United States as a whole. The irregular nature of the seam, its thinness and difficult roof conditions all pose problems for mechanization.

'Geological conditions are among the matters claimed by the plaintiffs as rendering application of the National Bituminous Coal Wage Agreement to this field economically impossible, and therefore demonstrating the conspiratorial purpose of the U.M.W. in disregarding these conditions and seeking to force the national contract upon the field. This can more appropriately be evaluated after development of the history of the field in its relations with the U.M.W. Suffice it to say at this time that geological conditions have of course been a factor in competition with other coal producing areas and had their effect upon mining practices followed in the Southeastern Tennessee field. However, other conditions largely unrelated to geological conditions have likewise played a part. These include management policies, a general undercapitalization throughout the field, the pyramiding of leases, the nature of the T.V.A. coal market, labor practices and attitudes upon the part of workers and collective bargaining as practiced in the field.' 265 F.Supp., *supra* at 424.

3) 'Turning first to the activity of West Kentucky (and Nashville) upon the T.V.A. spot market, it is the contention of the plaintiffs that these companies dumped extraordinarily large quantities of coal upon the spot market at steadily declining prices, particularly during the period from 1956 through 1958, forcing the price from 21.37¢ per millon b. t. u. in 1956 down to 16.50¢ per million b. t. u. in 1958. (In translating a b. t. u. price to a tonnage price, the quality of coal is a significant factor. However, on the average one cent per million b. t. u. is equal to approximately 25¢ per ton on a tonnage price basis.) The evidence does not sustain the plaintiffs' charge. Although West Kentucky bid in 1956, its bid in each instance was well above the market and it did not receive a single award. An analysis of the bids in 1957 and 1958 reveals that West Kentucky bid 22 times on the spot market, but received only five awards, these successful bids all being from Nashville Coal Company's Uniontown mine to the T.V.A. Shawnee steam plant. In not a single instance was West Kentucky the low bidder. In the first eight bids it was unsuccessful. On the ninth bid it got an award, but was the highest successful bidder. Its 10th, 11th and 12th bids were unsuccessful. Its 13th bid was successful, but again it was the highest successful bidder. Its 14th and 15th bids were unsuccessful. Its 16th and 17th bids were bid at the same price as the 14th and 15th bids, and were successful this time. In the 16th bid it was the highest successful bidder and in the 17th there were several lower bids. The 18th and 19th bids, at the same price as the four previous bids, were unsuccessful. The 20th bid was successful but was the second highest offer and there were no unsuccessful bidders on this solicitation. The 21st bid, at the same price, was unsuccessful. The 22nd bid was successful, but only by .02 mils per million b. t. u.' 265 F.Supp., *supra* at 419.

\* \* \* \* \* \*

'The following table is reconstructed from the record and reflects the bidding of West Kentucky on the T.V.A. term coal market in the period from 1959 through 1963:

| Date of Bid | T.V.A. Requisition # | Price Per Ton (f.o.b. mine) | Evaluated Relation to Other Bids | Award Made |
|---|---|---|---|---|
| 7/27/59 | 27 | $2.90 | 4th from lowest | T-3 |
| 2/ 9/60 | 32 | $2.90 | 19th from lowest | None |
| 9/ 1/60 | 35 | $3.00 | 5th from lowest | None |
| 2/14/61 | 37 | $2.90 | 3rd from lowest | T-24 |
| 9/18/62 | 41 | $2.90 | 7th from lowest | T-18 |
| 1/15/63 | 42 | $2.90 | 3rd from lowest | None |
| 6/19/63 | 43 | $2.90 | 2nd from lowest | None |
| 10/15/63 | 44 | $2.90 | Low bid | T-6 |

While the above table does not reflect the fact that the bid evaluations, due to transportation costs, varied from one steam plant to another, the evaluations used were either those upon which an award was made, or in event West Kentucky was unsuccessful in its bid, upon the evaluation most favorable to the plaintiffs. In only one instance was West Kentucky the low bidder and this was at the Gallatin plant where it enjoyed a transportation advantage. At the Widow's Creek plant West Kentucky was never closer than third from the lowest bidder, and this was only after the Section 22 freight rate reduction had been placed into effect.

'In this regard the plaintiffs sought to substantiate their conspiracy claim by reference to a freight rate reduction granted by the Interstate Commerce Commission in 1960 under Section 22 of the relevant statute. In that year The Louisville and Nashville Railroad Company and the Tennessee Valley Authority joined in requesting a rate reduction of railway freight rates for hauling coal from the western area of Kentucky to the Widow's Creek steam plant, the request being to reduce this rate from $2.-40 per ton to $1.60 or $1.40 per ton, depending upon the volume hauled. This reduction was opposed by coal operators in the Southeastern Tennessee coal field. The reduction was granted by the Inter-state Commerce Commission. There is no evidence that this had any relation to any conspiracy involving either the U. M.W. or West Kentucky Coal Company. In any event, since it involves an appeal to a governmental agency, it could not involve a Sherman Act violation. United Mine Workers v. Pennington, 381 U. S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626.

'The Court concludes that the evidence fails to establish that West Kentucky Coal Company or its subsidiary, Nashville Coal Company, engaged in predatory pricing of coal upon the T.V. A. market. It rather appears that West Kentucky and Nashville based their prices upon legitimate business considerations and were attempting at all times to meet competition, rather than lead the market downward. Having so concluded, it becomes unnecessary to consider further the responsibility of the U. M.W., if any, for West Kentucky and Nashville's coal pricing policies.' 265 F.Supp., *supra* at 422. (Footnote omitted.)

There is ample evidence in this record to support these findings; and we certainly cannot hold them to be 'clearly erroneous.' Fed.R.Civ.P. 52(a)." Ramsey v. UMW, 416 F.2d 655, 663–667 (6th Cir. 1969).

█ As we have previously noted the District Judge has reviewed these findings of fact under the preponderance of

evidence rule and reaffirmed them. On review of this lengthy record on remand and second appeal, we again hold that the District Judge's findings of fact are supported by substantial evidence and are not clearly erroneous.

It seems clear to us that the record in this case is one where the factual issues are close. The basic decisions (aside from the legal question of standard of proof) are for the finder of fact, whether that be a judge or a jury. This is, we think, the lesson of first *Ramsey* in the Supreme Court, Ramsey v. UMW, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971), and it certainly is the lesson of "second *Pennington*" (Lewis v. Pennington, 257 F.Supp. 815 (E.D.Tenn.1966), aff'd, 400 F.2d 806 (6th Cir. 1968), cert. denied sub nom. Pennington v. United Mine Workers, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968), rehearing denied, 393 U.S. 1045, 89 S.Ct. 616, 21 L.Ed.2d 599 (1969)). In *Pennington*, where the central allegations of antitrust conspiracy were identical with those in this case, and the Bituminous Coal Operators Association (BCOA) and UMW agreement of 1950 (as amended) with its Protective Wage Clause was the central legal document, the Supreme Court denied both certiorari and a rehearing after the Sixth Circuit had affirmed District Judge Taylor's dismissal of the complaint for failure to prove the antitrust conspiracy. Judge Taylor had held that such a result was required regardless of whether the standard of evidence was clear proof or preponderance of the evidence.

### III. Motion to Reopen

The third and final appellate issue of concern to us in this case is whether or not the District Judge should have reopened the record to allow the admission into evidence of the exhibits and depositions which plaintiffs sought to have admitted.

At the outset we note that the District Judge clearly read and considered all of the material which plaintiffs desired to present, and it is before us in the form of an offer of proof, and, like the District Judge, we have reviewed it. At oral argument counsel for plaintiffs on a direct question from the court informed us that if the case were remanded to the District Court, plaintiffs would have no further evidence to offer.

Judge Wilson's handling of this issue is set forth in the paragraphs of his opinion which follow:

Before undertaking a reconsideration of the evidence as a whole, as distinguished from its component parts as the Court has done to this point, it is appropriate that the Court should consider plaintiffs' motion to be allowed to reopen the proof in this case. In support of their motion the plaintiffs have made an offer of proof which consists of (1) the Minutes of the Joint Industry Contract Committee relating to the administration of the PWC by that Committee; (2) the deposition of Joseph E. Moody, President of the Southern Coal Producers Association from 1946 to 1960, together with the reports and minutes of that Association; (3) the deposition of Elmer C. Hill, Chief of the Fuels Procurement Branch of the TVA, who testified to the cancellation by West Kentucky Coal Company in 1965 of its long term coal sales agreements for the sale of coal to the TVA at the price of $2.90 per ton; and (4) stipulations entered in another lawsuit relating to the formation of the BCOA and including minutes of that Association and certain financial data. The Court has read and considered all of this evidence. Although voluminous, it is in very substantial measure cumulative to the proof offered upon the trial. The newly offered evidence offers no new theories of liability and presents no significant alteration of the evidence as presented upon the trial. The Court can envision no injustice in declining to reopen the trial. In view of the very extensive trial upon the issues, the substantially cumulative nature of the newly tendered proof, and the direction upon remand

in this case, the Court is of the opinion that the motion to reopen the proof should be denied. Ramsey v. UMW, 344 F.Supp. 1029, 1038 (E.D. Tenn. 1972).

We believe that it was the purpose of the Supreme Court remand to have the trial court review the original trial record on the standard of proof which the Supreme Court had declared to be the proper and legal one. There is not a line in Justice White's opinion which contains a suggestion that the record should be reopened on remand for the taking of additional evidence. We have no doubt that this fact strongly motivated the view on this issue taken by the District Judge, as it does us.

■ Generally, of course, parties to litigation must present their evidence when the case is called for trial. It is normal to wish to present additional evidence after once having lost a dispute of fact. But, of course, such a practice would lead to never-ending litigation. Additionally, reopening proof on the motion of one party long after trial has been completed can put the opposite party at a distinct disadvantage. Generally, motions for reopening are held to rest in the sound discretion of the trial judge. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331, 91 S. Ct. 795, 28 L.Ed.2d 77 (1971); Swartz v. New York Central R.R. Co., 323 F.2d 713, 714 (7th Cir. 1963); Locklin v. Switzer Brothers, Inc., 299 F.2d 160, 169–170 (9th Cir. 1961), cert. denied, 369 U.S. 861, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962); 6A J. Moore, Federal Practice ¶ 59.04[13] (2d ed. 1966).

■ Like the District Judge, however, we too have reviewed the evidence the plaintiffs-appellants sought to have admitted, and, like him, we do not think it changes the balance in this case. The additional evidence proffered was largely cumulative. We affirm the District Judge's decision denying the motion to reopen the record for the presentation of additional evidence. In the alternative, if this were held to be error, we would also hold that on the totality of evidence in this record (including consideration of the proffered evidence), such error was harmless. Fed.R.Civ.P. 61.

## IV. The Dissent

As we read the dissent, it argues two additional issues which we had not thought to be presented: 1) that under the Supreme Court remand appellants were entitled to a new trial, and 2) that appellants were entitled to prevail because the Protective Wage Clause represented a per se violation of the antitrust laws.

■ *New Trial.* The appellants, Ramsey, et al., had, indeed, sought a new trial. Appellant's brief before the Supreme Court contained the following paragraph:

Conclusions and Relief Sought

For the foregoing reasons, petitioners request this Court to reverse and set aside the judgments of the Sixth Circuit herein complained of, as well as the District Court's judgments, and to remand the cases with directions that UMW be adjudged in violation of the Sherman Act and that a new trial be granted for the determination of damages suffered by the petitioner under 15 U.S.C. Section 15, or, in the alternative, that petitioners be granted a new trial.

The Supreme Court did not grant either a new trial or a new trial limited to damages. Its order provided:

We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion. Ramsey v. United Mine Workers, 401 U.S. 302, 314, 91 S.Ct. 658, 665, 28 L.Ed.2d 64 (1971).

We have no doubt that if the Supreme Court had intended remand for new trial, it would surely have said so. In the case principally relied upon by the dissent, the order of the Supreme Court said in applicable part as follows:

[T]he Court of Appeals shall remand the case to the District Court

for a new trial. Byrd v. Blue Ridge Rural Electric Cooperative, 356 U.S. 525, 540, 78 S.Ct. 893, 902, 2 L.Ed.2d 953 (1958).

The Supreme Court remand clearly did not order either full or partial retrial of this lengthy and bitterly disputed litigation. Nor did this court's remand to the District Court do so.

Further, we find nothing in appellants' motion before the District Court, nor in their brief in this court, which either seeks or claims a right to a new trial. Before this court appellants' counsel specifically stated that the evidence proffered before the District Court was all that appellants wished to offer. We believe that the Supreme Court remanded this case for reconsideration of the original record under the newly declared standard of proof. For the reasons we have outlined in Section III of this opinion, we believe also that while the District Judge might, in the exercise of his discretion as trial court judge, have reopened proofs to allow additional materials into the record, he did not abuse that discretion in declining to do so.

*The Per Se Violation.* The District Judge considered the per se argument when this case was remanded to him:

With regard to the Protective Wage Clause (PWC), the plaintiffs reassert their former contention, namely that, as negotiated between the United Mine Workers (UMW) and the Bituminous Coal Operators Association (BCOA) in 1958 and inserted in the National Bituminous Coal Wage Agreement in that year, the PWC, upon proper construction, was an illegal bargain struck between the BCOA and the UMW wherein the latter expressly agreed to impose the wage and labor standards negotiated with the BCOA upon all other coal operators with whom it might in the future negotiate, thereby stripping the UMW of its freedom to bargain and its labor union exemption under the antitrust laws. These matters were carefully considered by the Court in its former

opinion. The conclusion was there reached that the PWC was limited to signatories only and did not commit or limit the Union in its bargaining with non-signatory coal operators (265 F.Supp. 388 at 412). Not only was this conclusion approved upon appeal in this case (416 F.2d 655 at 657), but the same conclusion was arrived at by both the trial court and the Court of Appeals in the case of Lewis v. Pennington, 257 F.Supp. 815 at 862, affirmed 400 F.2d 806 at 814.

The plaintiffs have approached the PWC from a somewhat new theory in their presentation upon remand. That theory is that the PWC would by its express terms limit the UMW in its future negotiations with all previous signatories of the National Agreement, thereby removing its exemption from the antitrust laws as a labor union, at least as to previous signatories. Some, if not all, of the plaintiffs herein were such previous signatories. The difficulty with this position is the same as with the plaintiffs' previously stated position, and that is that the PWC refers neither to future previous signatories, but rather refers to "signatory operators" and to "employees covered by this contract." The conclusion must accordingly be the same as was reached in the former opinion, namely that the PWC did not constitute an express commitment upon the part of the UMW to bargain with other coal operators only upon terms set forth in the contract made with the BCOA.

It may properly be noted here that nothing in the new evidence tendered in support of the plaintiffs' motion to reopen the proof would tend to alter this construction of the terms of the PWC. It may likewise be noted that the plaintiffs' contention that the PWC constituted an express commitment in violation of the antitrust laws would appear to be partially self-defeating in that most, if not all, of the plaintiffs were themselves parties to that agreement until December of

1962. Ramsey v. United Mine Workers, 344 F.Supp. 1029, 1034 (E.D. Tenn. 1972).

We agree.

■ In the prevailing opinion of this court in our first review of the *Ramsey* case, we dealt extensively with the argument that the Protective Wage Clause constituted a per se violation of the antitrust laws and held that it could not properly be construed to do so. *See* Ramsey v. United Mine Workers, 416 F. 2d 655, 657–659 (6th Cir. 1969), rev'd on other grounds, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). On review of this issue we now incorporate and adopt the reasoning of that opinion on the per se issue as set forth on pages 657–659, *supra*.

The judgment of the District Court is affirmed.

WEICK, Circuit Judge (dissenting).

At the outset it should be pointed out that the majority is in error in stating:

"We believe that the Supreme Court remanded this case for reconsideration of the *original* record under the newly declared standard of proof." (Emphasis added.) (*Infra,* at 754)[1]

The remand ordered by the Supreme Court contained only the following language:

"We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion." 401 U.S. 302 at 314, 91 S.Ct. 658 at 665, 28 L.Ed.2d 64.

It will be noted that no such limiting language of the majority opinion can be found in the Supreme Court's opinion, in its remand order, or in our remand. If the Supreme Court ever intended to confine the parties to the old record of the 1965-trial on the remand, it would certainly have said so in appropriate language. Likewise, if we intended to restrict the District Court to the original record, we should have used definite and clear language to that effect.

If there was any doubt about the matter (and there is not) it is resolved by examination of our order entered pursuant to the Supreme Court's mandate, vacating the judgment of the District Court and remanding to that Court, which order provided as follows:

"This cause is now before this Court upon the mandate of the United States Supreme Court, and in obedience thereto, IT IS HEREBY ORDERED:

1.) that this cause be, and it is, hereby remanded to the United States District Court for the Eastern District of Tennessee, Southern Division;

2) that the judgment of the said District Court heretofore entered in this cause be, and it is, hereby vacated; and

3) that further proceedings be had in said Court and cause consistent with the opinion of the United States Supreme Court, announced February 24, 1971, and reported as Ramsey v. United Mine Workers [401] U.S. [302] [91 S.Ct. 658, 28 L.Ed.2d 64] 39 U.S.L.Week, 4245."

Thus it is clear that the judgment of the en banc court, which automatically affirmed the judgment of the District Court, was reversed by the Supreme Court, and we in turn, instead of considering the matter further, vacated the judgment of the District Court and remanded for further proceedings consistent with the opinion of the Supreme Court. Our order of remand, like that of the Supreme Court, did not confine the District Court to consideration of only the old record.

As a result of the orders of the Supreme Court and of this Court the judgment of the District Court was opened

---

[1]. The opinion of the en banc court, which lacked concurrence of a majority of the Judges of this Court, merely copied and approved the panel's slip opinion. The judgment of the District Court was affirmed only by an equally divided Court, which decision was reversed by the Supreme Court.

and all that was before the Court on the remand was a pending action in which each of the parties was entitled to a new trial as a matter of right. The order of remand of the Supreme Court and that of this Court merely required the District Court, in its consideration of the case, to apply the preponderance of evidence rule on the charge of antitrust violation, instead of applying the clear proof rule which it had erroneously applied in the first trial.

The trouble is that the District Court erroneously treated the remand in the same manner as the majority now treats it. The District Court even denied the plaintiffs a hearing, including their right to offer additional new documentary evidence. In so doing the District Court not only abused its discretion but it deprived the plaintiffs of their process rights.

Plaintiffs filed in the District Court a "Motion of Plaintiffs for an Order Opening the Record for Additional Evidence and Setting the Times for the Production and Filing of Such Evidence." Attached to the motion was documentary proof which had not been offered in evidence at the 1965-trial.

In its opinion the District Court conceded that the proof had been proffered, stating:

"In support of their motion the plaintiffs have made an offer of proof which consists of (1) the Minutes of the Joint Industry Contract Committee relating to the administration of the PWC by that Committee; (2) the deposition of Joseph E. Moody, President of the Southern Coal Producers Association from 1946 to 1960, together with the reports and minutes of that Association; (3) the deposition of Elmer C. Hill, Chief of the Fuels Procurement Branch of the TVA, who testified to the cancellation by West Kentucky Coal Company in 1965 of its long term coal sales agreements for the sale of coal to the TVA at the price of $2.90 per ton; and (4) stipulations entered in another lawsuit relating to the formation of the BCOA and including minutes of that Association and certain financial data." (344 F.Supp. at 1038).

The plaintiffs state that their proffer and its purpose were as follows:

"This Motion had attached to it documentary evidence which had been produced in later cases which evidence plaintiffs offered to give conclusive proof there was an implicit 'quid pro quo' deal made by UMW such as had been found on the preponderance of evidence, but also and more particularly to prove the circumstances and intentions of the parties in writing the PWC in the national contract in 1958, and the practical construction given that clause by the parties who drafted it in their activities as members of the Joint Industry Contract Committee (JICC) which policed the PWC. This evidence was largely in the form of the minutes of committees and of coal associations which sponsored the PWC and also the deposition of the head of one of the coal associations who was the prime mover in bringing the PWC into being (App. pp. 22a–179a)." (Appellants' Brief, p. 6).

There was a "quid pro quo" whereby the union stipulated that it would not enter into collective bargaining agreements with other operators except on the same wages, hours and working conditions as were contained in the national contract, and the operators, who were signatories to the national contract, in turn agreed to boycott coal not produced by others in conformity with said contract.

The "quid pro quo" was admitted by counsel for UMW in Tennessee Consol. Coal Co. v. UMW, 416 F.2d 1192 (6th Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970), and was referred to by the Supreme Court in *Ramsey*, 401 U.S. at 305, n.1, 91 S.Ct. 658. We also discussed "quid pro quo" in Riverton Coal Co. v. UMW, 453 F.2d 1035, at 1039, 1040, n.2 (6th Cir. 1972), cert. denied, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690.

They even set up a joint committee to enforce compliance by the parties.

Since the case was already reopened, it was unnecessary for plaintiffs to file a motion to reopen. Plaintiffs were entitled to offer the new evidence as a matter of right.

In Byrd v. Blue Ridge Rural Elec. Co-Op., Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), the plaintiff recovered a judgment for personal injuries against the defendant in the District Court, which had stricken defendant's defense of Workmen's Compensation. The Court of Appeals reversed and remanded with instructions to dismiss the complaint. The Supreme Court reversed the dismissal of the complaint, holding that the case should be remanded for a new trial because plaintiff did not have the opportunity to offer evidence in the District Court on the changed ruling on Workmen's Compensation. Mr. Justice Brennan, who wrote the opinion for the Court, stated:

"At all events, the petitioner is plainly entitled to have an opportunity to try the issue under the Court of Appeals' interpretation. His motion to dismiss the affirmative defense, properly viewed, was analogous to a defendant's motion for involuntary dismissal of an action after the plaintiff has completed the presentation of his evidence. Under Rule 41(b) of the Federal Rules of Civil Procedure, in such case 'the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.'" (356 U.S. at 532, 78 S.Ct. at 898).

Justice Brennan further stated that the Workmen's Compensation issue should be submitted to the jury for determination.

So, in our case, the plaintiffs must be afforded the opportunity to try the issue under the Supreme Court's interpretation. This does not mean that the record of the 1965-trial may not be used. The District Court should consider the old record supplemented with such additional evidence as either of the parties may offer. White v. Rimrock Tidelands, Inc., 414 F.2d 1336 (5th Cir. 1969).

The reasons given by the District Court for denial of a hearing and an opportunity to offer new evidence on the remand cannot be supported. The Court stated:

"The Court has read and considered all of this evidence. Although voluminous, it is in very substantial measure cumulative to the proof offered upon the trial. The newly offered evidence offers no new theories of liability and presents no significant alteration of the evidence as presented upon the trial. The Court can envision no injustice in declining to reopen the trial. In view of the very extensive trial upon the issues, the substantially cumulative nature of the newly tendered proof, and the directions upon remand in this case, the Court is of the opinion that the motion to reopen the proof should be denied." (344 F. Supp. at 1038).

It is obvious that the evidence proffered was new, but the Court excluded it because "[a]lthough voluminous, it is in very substantial measure cumulative to the proof offered upon the trial." The Court does not point out what part was cumulative and what part was not cumulative. No findings of fact or conclusions of law were adopted by the Court with respect to the new evidence, making it impossible for an appellate court to review without reading the entire voluminous new evidence.

The Court's statement that it read and considered the new evidence is a non sequitur. Having considered the new evidence, the Court should have admitted it and adopted findings of fact and conclusions of law with respect to it.

It is not important that the new evidence offered "no new theories of liability and presents no significant alteration of the evidence as presented upon the

trial." What was important is the fact that the new evidence did portray the circumstances surrounding the entering into of PWC between the union and the big operators, and the practical construction of it by the parties. The minutes of the Joint Industry Contract Committee, whose members drafted PWC, certainly threw light on the language of the agreement. Since PWC was claimed to be ambiguous, all of this evidence was certainly admissible. Tennessee Consol. Coal Co. v. UMW, 416 F. 2d 1192 (6th Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970).

Although the Court stated that it "can envision no injustice in declining to reopen the trial," it is clear that the trial was already reopened and that a real injustice has been done to the plaintiffs by the denial of a hearing and the exclusion of the new evidence. The new documents provided more than a preponderance of evidence that the union had conspired with the operators to violate the antitrust laws.

The Court concluded its opinion by adopting its former opinion reported at 265 F.Supp. 388 (E.D.Tenn.1967), except as modified. The judgment entered on this prior opinion was vacated by this Court.

We do not understand the majority's view that the new evidence which was rejected by the District Court, does not change the balance of the case; nor do we agree with its alternative, that if the exclusion was erroneous such error was harmless under Rule 61, Fed.R.Civ.P.[2] Such rejection deprived the plaintiffs of their due process rights.

In a case where, as here, the majority opinion admits that the factual issues are close, the Court should have welcomed the offering of additional evidence. Even though part of such evidence was cumulative, it certainly strongly supported the evidence which was in the old record, at least to cause such additional evidence to preponderate in favor of the plaintiffs.

The majority relies on Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); Swartz v. New York Central R.R., 323 F.2d 713, 714 (7th Cir. 1963); and Locklin v. Switzer Bros. Inc., 299 F.2d 160, 169–170 (9th Cir. 1961), cert. denied, 369 U.S. 861, 82 S.Ct. 950, 8 L. Ed.2d 18 (1962). Such reliance is misplaced. *Zenith* involved a motion to amend the complaint and to offer additional evidence during the course of a trial, which motion the District Court denied on the ground that it would operate to prejudice Zenith. *Swartz* involved a motion to reopen after plaintiff had rested his case and without making any tender of specific new evidence. *Locklin* involved the offering of new evidence in a post-trial proceeding which the Court denied. None of these cases involved the construction of a remand order of an appellate court, or the right to offer new evidence when an appellate court had vacated the judgment of the District Court, leaving only a pending case.

2. This statement of harmless error would seem to conflict with the language on page 752 of the majority opinion, that "It seems clear to us that the record in this case is one where the factual issues are close."

It will be recalled that the same District Judge presided at the trial of the case of Tennessee Consol. Coal v. UMW, 416 F.2d 1192 (6th Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970). That case involved facts virtually identical with the facts in the case at bar, and was submitted to a jury which returned a verdict in favor of the plaintiff for $977,500. The District Court ordered a remittitur of $500,000, and then trebled the balance, entering judgment in favor of Tennessee Coal for $1,432,500, and in favor of Grundy, a co-plaintiff, for $67,500. The Court also allowed attorneys' feees of $150,000 to counsel for plaintiffs.

If the majority's alternative is correct, it would have been the duty of the District Court in the *Tennessee Coal* case to set aside the verdict and dismiss the complaint.

## THE CLEARLY ERRONEOUS RULE

The majority, quoting extensively from the en banc opinion, which lacked approval by a majority of the Court, and from the initial opinion of the District Court (judgments entered on both of which were reversed on other grounds by the Supreme Court), applies the clearly erroneous rule to the findings of fact made by the District Court in 1972 on evidence offered at the trial in 1965. As will be pointed out, the clearly erroneous rule has no application here and it is error to apply it.

The District Judge would have to have had a miraculous memory to recall the evidence and the credibility of witnesses throughout that protracted trial of seven years ago. It is obvious that the Court was required to and did refresh its recollection by examination of the many printed volumes of appendices and the multitude of exhibits. Whether the District Judge in 1972 could have recalled also the manner and demeanor of the witnesses as they appeared before him in 1965, when he was applying an erroneous standard of proof, is open to serious question.

During the many weeks of protracted trial which took place in 1965, the District Judge had ample opportunity to see and observe the witnesses, to hear them testify, and to determine their credibility. While the matter presumably was fresh in his mind he prepared his fifty-page opinion, in which he made the following finding of fact:

"Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that U.M.W. did so impliedly agree." Ramsey v. UMW, 265 F.Supp. at 412 (1967).

In the en banc court, Judge O'Sullivan, who wrote the opinion for the four dissenting Judges, which opinion the Supreme Court upheld on the clear proof issue, stated:

"Judge Wilson specifically found that, *by preponderance of the evidence,* plaintiffs had established that the joint action of the BCOA and the Mine Workers in entering into and using the National Bituminous Coal Wage agreement with its Protective Wage Clause, and the implementing of them, established an agreement violating the Sherman Act. While he did not express himself as to how he would have found as to all of the other issues of fact had he adhered to the traditional preponderance of evidence rule, he made it plain that he followed the 'clear proof' rule in passing on responsibility for violent conduct by agents or members of the union." (416 F.2d at 674).

Mr. Justice White, who wrote the opinion for the Supreme Court, referred to this finding of the District Court as follows:

"As for an implied conspiracy to standardize employment terms throughout the industry aimed at destroying marginal producers, the trial court said that '[w]ere this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U.M.W. did so impliedly agree,' but that 'the standard of proof where a labor union is involved is "clear proof," as required by Section 6 of the Norris-LaGuardia Act, a standard different from the ordinary civil burden of persuasion.' 265 F.Supp. at 412. Judged by this stricter standard, proof of conspiracy was found wanting and the case against the Union failed." (Footnotes omitted.) (401 U.S. at 306, 91 S.Ct. at 662, 28 L.Ed. 2d 64).

Now after the lapse of seven years, on reviewing a cold record the District Judge, in his second opinion changes his mind and tells us that his finding of fact on the preponderance issue, on which both this Court and the Supreme Court relied and clearly understood, was only dictum. He explained it as follows:

"In its original opinion the Court in what it deemed to be *dictum* concluded that the preponderance rule would favor an inference that the PWC did by

implication what it had not expressly done. The Court was motivated to such a finding by three considerations. One consideration was that thereafter the UMW did in fact negotiate contracts only upon the wage and labor standards set in the National Contract. Another consideration was that BCOA and its members did have a competitive motive, as evidenced by the PWC itself and its administration, to seek such a result. A third consideration was that complaints were in fact registered with UMW by signatory operators from time to time regarding the competitive advantage of non-signatory operators." (Emphasis added.) (344 F.Supp. at 1037).

It does appear to be somewhat of a coincidence that in the Supreme Court UMW claimed that the District Judge's holding on the clear proof issue was mere dictum. The Supreme Court disposed of this frivolous claim of the Union, as follows:

"Here the Union's claim is belied by the language of the trial court's opinion and its interpretation by the eight judges of the Court of Appeals. The second proposition—that the trial court's clear-evidence ruling was mere dictum—leaves unexplained the Court of Appeals' affirmance by an equally divided court as well as the trial judge's remarks that he would or might have reached different results on some issues, apparently including some aspects of the conspiracy issue, if preponderance of the evidence was the governing standard. To what extent the proof would fail under the standard we here hold applicable and what legal difference it might make are matters open to be dealt with on remand. We do note from the trial court's opinion that except for violence and some picketing, issues of union responsibility for acts alleged and proved were nonexistent or played little part in the thinking of the trial judge." (401 U.S. at 308, n. 5, 91 S. Ct. at 662).

Because of the lapse of seven years' time between the date of the trial and the second opinion of the District Judge, and his necessity of re-examination of the record, and because the original record consisted of over 5,600 pages and 450 exhibits (and the supplemental record is likewise voluminous), we regard it now as essentially a "paper case", where the clearly erroneous test of Rule 52(a) of the Federal Rules of Civil Procedure is inapplicable. United States v. General Motors Corp., 384 U.S. 127 at 141, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); In Re Clemens, 472 F.2d 939, 941, n. 1 (6th Cir. 1972).

In any event, the ultimate conclusion of the District Judge is not shielded by the clearly erroneous rule.

In United States v. General Motors, *supra,* the Court said:

"We note that, as in United States v. Parke, Davis & Co., 362 U.S. 29, 44–45, 80 S.Ct. 503, 4 L.Ed.2d 505, the ultimate conclusion by the trial judge, that the defendants' conduct did not constitute a combination or conspiracy in violation of the Sherman Act, is not to be shielded by the 'clearly erroneous' test embodied in Rule 52(a) of the Federal Rules of Civil Procedure." (384 U.S. at 141, n. 16, 86 S.Ct. at 1328).

## THE SECOND OPINION OF THE DISTRICT COURT

The District Court stated in more than one place that there was no *direct* evidence of a conspiracy. It is submitted that this is true in most conspiracy cases. The conspiracy, ordinarily, must be shown by circumstantial evidence. The present case, however, comes as close as any case we have ever read, as establishing an express agreement.

The Protective Wage Clause provides in Paragraph "A" of the agreement of UMW, as follows:

"A. During the period of this Contract, the United Mine Workers of America will not enter into, be a par-

ty to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto."

BCOA requested this paragraph. 265 F.Supp. 410.

If this language means anything, it is clear that UMW has bound itself not to enter into any agreement and not to be a party to any agreement or understanding covering wages, hours and working conditions on any basis other than as specified in this contract.

In Paragraph "B" of PWC the signatory operators agree to boycott coal not produced in accord with the National Agreement.

In Paragraphs "C" and "E" a "Joint Industry Contract Committee" and "Joint District Contract Committee" are set up to act as tribunals to try UMW or any operator for violation of the provisions of PWC.

We note that the District Court has construed Paragraph "A" of PWC as binding UMW to insist on identical terms against only "signatories". Paragraph "A" does not so state, but on the contrary it clearly prevents UMW from entering into any agreement or even understanding on any basis other than those specified therein. To construe it otherwise tortures its plain language. The District Judge further found that after PWC, "UMW did in fact negotiate contracts only upon the wage and labor standards set in the National Contract." 344 F.Supp. 1037. The plain language of PWC required UMW to do exactly that.

The Court further found "that BCOA and its members did have a competitive motive, as evidenced by PWC itself and its administration, to seek such a result." 344 F.Supp. 1037.

These findings of the District Court not only do not support its ultimate conclusion of no agreement, but require a result opposite that reached by the District Court. The findings are clear that the parties to PWC, the union and the big operators, construed PWC as requiring the union not to enter into any agreement with other operators except on identical terms with the National Contract.

After stating again that there was no direct evidence of conspiracy, the District Court was impressed by the fact that the officials of UMW and the big operators, in their testimony, denied that they conspired. It could hardly be expected that they would do otherwise. In any event, the acts of the officials of UMW and the big operators speak much louder than their words.

The District Judge further stated that "the motives of UMW and BCOA appear to have coincided," but he was of the view that a "concidence of motives does not of itself connote a Sherman Act conspiracy . . . ." 344 F.Supp. 1038, 1039. While these motives may not constitute a conspiracy per se, they do constitute strong and persuasive evidence which, when considered along with the other written and oral evidence in the case, clearly establish the agreement.

The District Court appears to have been influenced by the fact that the activities of the union, which the Court graphically portrayed as including mass picketing, violence and bloodshed, would not have violated the Sherman Act if the union had acted unilaterally. But the fact is that UMW did not act unilaterally. It acted as it was required to act under the agreement with the big operators, each one aiding and abetting the other. The agreement provided even for methods of enforcing compliance therewith, by each party. These activities

put the marginal operators out of business, as they could not operate under the onerous terms of the National Contract.

In Allen Bradley Co. v. Local Union, Bhd. Elec. Workers, 325 U.S. 797, 65 S. Ct. 1533, 89 L.Ed. 1939 (1945), the Court held that the Sherman Act was violated when unions "aid non-labor groups to create business monopolies and to control the marketing of goods and services."

The closing paragraph of the majority opinion of the Supreme Court in the present case states:

"Where a union, by agreement with one set of employers, insists on maintaining in other bargaining units specified wage standards ruinous to the business of those employers, it is liable under the antitrust laws for the damages caused by its agreed-upon conduct." (401 U.S. at 313, 91 S.Ct. at 665).

The District Court stated that plaintiffs' contention that PWC constituted an express commitment in violation of the antitrust laws was "self-defeating," apparently on the theory that plaintiffs were signatories thereto and would be in pari delicto. Taking into account the acts of the union which compelled plaintiffs and other operators to sign, and the efforts of plaintiffs to get out from under the contract, this defense does not hold water. UMW did not raise this defense and it was not considered in the prior appeal in this Court, nor in the Supreme Court. We do not know why the District Court raised it. It would seem to be against public policy to permit such a defense in this type of action. Cf., South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767, 783–784 (6th Cir. 1970).

Judge O'Sullivan, who wrote the opinion for the four dissenting Judges in the prior appeal (which the Supreme Court affirmed on the clear proof issue), aptly described the manner in which PWC was implemented by UMW and the big operators. He stated:

"Plaintiffs' evidence in this case generously portrayed how propitious was the setting for the victory achieved by the BCOA and the Mine Workers in implementing their agreement. The District Court opinion at length sets out the relevant facts. Among other things, it was shown that the Mine Workers loaned to one Cyrus Eaton some $25,000,000 to enable him to acquire *for them* control of the capital shares of West Kentucky Coal Company—the biggest of the members of BCOA—and its subsidiary, Nashville Coal Company. By having Eaton so invest the union's money, the Mine Workers acquired the voting rights of West Kentucky Coal Company and Eaton became Chairman of the Board, and:

'Immediately after Mr. Eaton assumed control, West Kentucky signed the National Bituminous Coal Wage Agreement, the first time in its history that it had signed a contract with the U.M.W.' 265 F.Supp. at 414.

Judge Wilson further observed:

'Furthermore, the reasons for which loans and investments were made in West Kentucky and its subsidiary, Nashville Coal Company, must likewise largely be inferred, *as the reasons given by the U.M.W. for doing so will not bear scrutiny.*' 265 F.Supp. at 414. (Emphasis supplied.)

"It would indeed be over kind to accord credence to the asserted claim that the making of the National Bituminous Coal Wage Agreement and the Protective Wage Clause between the United Mine Workers and their controlled West Kentucky Coal Company was an 'arm's length' transaction, free of conspiratorial and predatory purpose. The Mine Workers lost eight of the twenty-five million dollars which it invested in the management side of the accused transactions. For its victory, it was apparently willing to pay this bill as well as the many hundreds of thousands of dollars which it paid for the depredations and

violence—the reign of terror—which it employed in driving out of coal mining those who could not live with the terms of the National Bituminous Wage Agreement. See Flame Coal Co. v. United Mine Workers, 303 F.2d 39 (6th Cir. 1962); United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716 (6th Cir. 1960), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960); Gilchrist v. United Mine Workers, 290 F.2d 36 (6th Cir. 1961). District Judge Wilson described the Mine Workers' conduct in this language:

'The evidence in this case reflects once again that the "history of the bituminous coal industry is written in blood as well as ink." Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263.' 265 F. Supp. at 428.

and further,

'A great deal of violence, bloodshed and destruction of property has accompanied the strike [discussed in the opinion]. Much suffering, deprivation and want has occurred. The Southeastern Tennessee coal field remains a blighted area.' 265 F.Supp. at 428.

He sums up the situation as follows:

'In the period since 1960 the coal operators in the Southeastern Tennessee coal field have been unable to compete and survive in the T.V.A. coal market under the National Bituminous Coal Wage Agreement. While in many instances this appears to have been due to antiquated mining methods and equipment or other causes, the fact nevertheless remains that since 1960 there has not been a single instance of a successful coal mining operation in the Southeastern Tennessee coal field under the National Bituminous Coal Wage Agreement and this in spite of the fact that the *only feasible alternative facing most coal operators in the area was to operate under the national contract or go out of business.'* 265 F.Supp. at 430. (Emphasis supplied.)

"There is nothing in the record of this case to suggest that the conception and prosecution of the grand plan we deal with was the work of irresponsible underlings. The total enterprise was directed from high echelons of authority. Top people of the United Mine Workers and the Bituminous Coal Operators Association did not need the protection of Norris-LaGuardia when they negotiated and signed the National Bituminous Coal Wage Agreement and its Protective Wage Clause, nor when the Mine Workers invested $25,000,000 to aid the big coal companies to fulfill the promise of the plan.

"Peace has indeed come to Southeastern Tennessee's part of Appalachia, but it is the peace of obedience to the overlords of big business and big labor. Of this situation, Mr. Justice Douglas, in his Pennington concurrence, appropriately observes:

'Congress can design an oligopoly for our society, if it chooses. But business alone cannot do so as long as the antitrust laws are enforced. Nor should business and labor working hand-in-hand be allowed to make that basic change in the design of our so-called free enterprise system.' 381 U.S. at 674, 85 S.Ct. at 1595–1596." (416 F.2d at 675–676).

From the foregoing, it is clear that the District Court did not comply with the mandate of this Court, nor with that of the Supreme Court. Because of the grievous errors heretofore pointed out, the judgment of the District Court should be reversed and the case remanded with instructions to admit the tendered evidence and to determine the case anew on the basis of the old record plus any additional relevant evidence which any of the parties may offer. In the event that UMW does not offer additional evidence compelling a conclusion different from that reached in this dissenting opinion, the Court should find in favor of the plaintiffs and assess damages.