George **RAMSEY** et al., Plaintiffs,

v.

The **UNITED MINE WORKERS OF AMERICA**, Defendant.

**TENNESSEE PRODUCTS AND CHEMICAL CORPORATION**, Plaintiff,

v.

The **UNITED MINE WORKERS OF AMERICA and West Kentucky Coal Company**, Defendants.

**Nos. 3667 and 4189.**

United States District Court, E. D. Tennessee, S. D.

June 29, 1972.

---

Clarence E. Walker, Sizer Chambliss, Chattanooga, Tenn., A. A. Kelly and Wm. M. Ables, Jr., South Pittsburg, Tenn., John A. Rowntree, Knoxville, Tenn., for George Ramsey, and others.

E. H. Rayson and R. A. Kramer, Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn., Harrison Combs, Washington, D. C., M. E. Boiarsky, Charleston, W. Va., for United Mine Workers of America.

Waller, Lansden & Dortch, Nashville, Tenn., Fowler, Rowntree & Fowler, Knoxville, Tenn., for Tenn. Products and Chemical Corp.

E. H. Rayson and R. A. Kramer, Knoxville, Tenn., Willard P. Owens and Harrison Combs, Washington, D. C., M. E. Boiarsky, Charleston, W. Va., for United Mine Workers of America and West Kentucky Coal Co.

OPINION

FRANK W. WILSON, Chief Judge.

In these lawsuits a number of coal operators in the Southeastern Tennessee coal fields seek to recover damages of the United Mine Workers of America for alleged violations of the antitrust laws of the United States. The cases were tried several years past by this Court sitting without a jury. The trial, extending over a period of weeks, accumulated a very extensive record, consisting of more than 5600 pages of testimony and more than 450 exhibits, many of the exhibits themselves being quite voluminous. After having the benefit of extensive briefs, the Court entered its opinion, which opinion is set forth in some 50 pages of the Federal Supplement and in which the Court concluded that the evidence failed to establish a Sherman Act violation on the part of the defendant. See Ramsey v. United Mine Workers of America, 265 F.Supp. 388 (D.C.1967). In line with the provisions of Section 6 of the Norris-LaGuardia Act (29 U.S.C. § 106) and in line with what it believed to be the controlling authority in the cases of United Mine Workers of America v. Pennington, 381

U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and United Mine Workers of America v. Gibbs, 383 U.S. 715, 716, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), this Court applied the "clear proof" standard in weighing all matters in issue. Upon appeal the application of this standard of proof was affirmed by an equally divided Court of Appeals sitting en banc, and the decision of this Court in denying recovery was affirmed. Ramsey v. United Mine Workers of America, 416 F.2d 655 (6th Cir., 1969). The United States Supreme Court granted certiorari and a divided court concluded that the clear proof standard required by Section 6 of the Norris-LaGuardia Act had application only to certain issues with the remaining issues to be weighed in accordance with the usual preponderance of the evidence rule generally applicable to civil lawsuits. Ramsey v. United Mine Workers, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). The case was accordingly remanded for further consideration by this Court in light of the Supreme Court opinion. Upon remand the plaintiffs have moved to be allowed to reopen the proof and submit additional evidence. Briefs have been filed both upon the remand and upon the plaintiffs' motion to reopen the proof. The case is accordingly now before the Court upon the remand from the Supreme Court and upon the plaintiffs' motion to be allowed to reopen the proof. The necessity for or the propriety of reopening the proof can better be judged following some analysis of the legal and factual issues involved in this remand.

Since the remand of the case, the Court has undertaken a full review of the record upon the trial of the case, has restudied the original trial briefs of the parties as well as the briefs filed upon this remand. The Court has likewise carefully read and considered the evidence submitted upon the plaintiffs' offer of proof in support of their motion to reopen the evidence.

Without commenting at this point upon the inferences that may have been drawn from proven facts, nothing in

this restudy of the record has revealed unto the Court any error in the statement of proven facts as set forth in its former opinion in 265 F.Supp. 388. Rather, the Court remains of the view that the facts, other than those to be inferred, and other than as may be supplemented herein, are correctly set forth in its former opinion. That opinion will accordingly be adopted by the Court except as it may be expressly corrected or supplemented in this opinion. Before commenting further upon the factual record, certain comments upon the law are in order.

### Legal Guidelines

In its original opinion this Court set forth the legal guidelines by which its decision must be governed (265 F.Supp. 388 at 395–400). A review of those legal guidelines in light of the subsequent appellate review of this case would reveal but two areas in which additional comments or corrective statements need be made. A corrective statement will need to be made in regard to the standard of proof to be applied in the case. Further comment will be in order in regard to the need or lack of need for proof of predatory intent, or the applicability of the per se rule, in a case of this nature.

In its former opinion, relying upon United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and United Mine Workers v. Gibbs, 383 U.S. 715, 716, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), this Court had the following to say regarding the burden of proof:

"One further subject needs to be given attention here and that is the standard of proof that must govern a proceeding involving a Sherman Act charge against a labor union. The burden of proof borne by the plaintiff is not the usual preponderance of the evidence rule applicable in civil cases generally. The requirement imposed by Section 6 of the Norris-LaGuardia Act is that of "clear proof" where a labor organization is a party to an action such as this. (29 U.S.C. § 106)"

This statement has now been held to be in error insofar as it interpreted Section 6 of the Norris-LaGuardia Act as requiring clear proof of all issues rather than clear proof of a labor union's authorization, participation in, or ratification of acts allegedly performed upon its behalf, with the usual preponderance of the evidence rule applying to all other issues. The rule to be applied is stated thusly in Ramsey v. United Mine Workers, 401 U.S. 302 at 311, 91 S.Ct. 658 at 664:

"In our view § 6 requires clear and convincing evidence only as to the Union's authorization, participation in, or ratification of the acts allegedly performed on its behalf. Nor do we discern any basis for our fashioning a new standard of proof applicable in antitrust actions against labor unions. Accordingly the District Court erred in requiring petitioners' compliance with the standard of § 6 in proving other elements of their treble-damage case against the Union."

In line with this statement the Court must accordingly reconsider and reweigh each element of the evidence, applying the appropriate standard of proof to that element.

Before leaving the statement of legal guidelines as set forth in this Court's original opinion, some further comment is in order regarding the need or lack of need for proof of predatory intent before a labor union may be held liable for participation in a conspiracy under the Federal Antitrust Laws. This matter was discussed by this Court in its former opinion, but it was there pointed out that some lack of clarity existed because of the differences expressed on the subject in the three opinions filed in the *Pennington* case with no one opinion having the support of a majority of the Court. Both the District Court (257 F. Supp. 815 at 829) and the Court of Appeals (400 F.2d 806 at 814) upon retrial of the *Pennington* case interpreted the

Supreme Court decision in that case as requiring proof of predatory intent.

These matters are now clarified by the following language from the opinion of Justice White in the *Ramsey* case, which opinion secured the concurrence of a majority of the Court:

"Finally, petitioners in effect ask us to reconsider our holding in *Pennington* and other cases that under the Clayton and Norris-LaGuardia Acts the Union incurs no liability under the antitrust laws when it concludes 'a wage agreement with the multi-employer bargaining unit . . . and . . . as a matter of its own policy, and not by agreement with all or part of the employers of that unit, seek[s] the same wages from other employers.' 381 U.S. at 664, 85 S.Ct. at 1590, 14 L.Ed.2d at 633. This we decline to do. The Court made it unmistakably clear in Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 811, 65 S.Ct. 1533, 1540, 89 L.Ed. 1939, 1949 (1945), that unilateral conduct by a union of the type protected by the Clayton and Norris-LaGuardia Acts does not violate the Sherman Act even though it may also restrain trade. '[T]hese congressionally permitted union activities may restrain trade in and of themselves. There is no denying the fact that many of them do so, both directly and indirectly.' But 'the desirability of such an exemption of labor unions is a question for the determination of Congress.' 325 U.S. at 810, 65 S.Ct. at 1540, 89 L.Ed. at 1949. We adhere to this view. But neither do we retreat from the 'one line which we can draw with assurance that we follow the congressional purpose. We know that Congress feared the concentrated power of business organizations to dominate markets and prices . . . . A business monopoly is no less such because a union participates, and such participation is a violation of the Act.' Id., at 811, 65 S.Ct., at 1540, 89 L.Ed. at 1949. Hence we also adhere to the de-

cision in *Pennington*: [T]he relevant labor and antitrust policies compel us to conclude that the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws.' 381 U.S. at 669, 85 S.Ct. at 1593, 14 L.Ed.2d at 635. *Where a union, by agreement with one set of employers, insists on maintaining in other bargaining units specified wage standards ruinous to the business of those employers, it is liable under the antitrust laws for the damages caused by its agreed-upon conduct.*" (Emphasis supplied)

■ The foregoing language to which emphasis has been added would appear to have eliminated any need for proof of predatory intent, and to have established a per se rule of labor union antitrust liability where it is made to appear by a proper standard of proof that the Union has agreed with one or more employers to maintain specified wage standards in negotiations with other employers and where such wage standards are shown to be ruinous to the business of the other employers. Since conspiracy is the basis of such liability, the same rule of antitrust liability would apply to all employers participating in the agreement.

*Protective Wage Clause*

Having carefully reviewed its former opinion in this case in light of the directions given upon remand and in light of the present record in the case, the Court deems it appropriate to consider further only that portion of its former opinion dealing with the Protective Wage Clause (265 F.Supp. 388 at 410–412) and that portion setting forth the ultimate conclusions of the Court in light of all of the evidence when viewed as a whole (265 F.Supp. 388 at 431 et seq.). With respect to all other portions of its former opinion, the Court now concludes that its findings therein are correct and in accordance with the record, whether that record be viewed in light of the prepon-

derance rule or in light of the clear proof rule.

With regard to the Protective Wage Clause (PWC), the plaintiffs reassert their former contention, namely that, as negotiated between the United Mine Workers (UMW) and the Bituminous Coal Operators Association (BCOA) in 1958 and inserted in the National Bituminous Coal Wage Agreement in that year, the PWC, upon proper construction, was an illegal bargain struck between the BCOA and the UMW wherein the latter expressly agreed to impose the wage and labor standards negotiated with the BCOA upon all other coal operators with whom it might in the future negotiate, thereby stripping the UMW of its freedom to bargain and its labor union exemption under the antitrust laws. These matters were carefully considered by the Court in its former opinion. The conclusion was there reached that the PWC was limited to signatories only and did not commit or limit the Union in its bargaining with non-signatory coal operators (265 F.Supp. 388 at 412). Not only was this conclusion approved upon appeal in this case (416 F.2d 655 at 657), but the same conclusion was arrived at by both the trial court and the Court of Appeals in the case of Lewis v. Pennington, D.C., 257 F.Supp. 815 at 862, affirmed 6 Cir., 400 F.2d 806 at 814.

■ The plaintiffs have approached the PWC from a somewhat new theory in their presentation upon remand. That theory is that the PWC would by its express terms limit the UMW in its future negotiations with all previous signatories of the National Agreement, thereby removing its exemption from the antitrust laws as a labor union, at least as to previous signatories. Some, if not all, of the plaintiffs herein were such previous signatories. The difficulty with this position is the same as with the plaintiffs' previously stated position, and that is that the PWC refers neither to future nor previous signatories, but rather refers to "signatory operators" and to "employees covered by this contract." The conclusion must accordingly be the same as was reached in the former opinion, namely that the PWC did not constitute an express commitment upon the part of the UMW to bargain with other coal operators only upon terms set forth in the contract made with the BCOA.

It may properly be noted here that nothing in the new evidence tendered in support of the plaintiffs' motion to reopen the proof would tend to alter this construction of the terms of the PWC. It may likewise be noted that the plaintiffs' contention that the PWC constituted an express commitment in violation of the antitrust laws would appear to be partially self-defeating in that most, if not all, of the plaintiffs were themselves parties to that agreement until December of 1962.

■ There remains to reconsider the Court's conclusion in its former opinion that the evidence likewise failed to establish an implied or secret agreement between the BCOA and the UMW whereby the latter agreed to impose the National Contract negotiated with the BCOA upon all other coal operators with whom it might engage in collective bargaining. This conclusion was reached by the Court upon the assumption that such an implied or secret agreement must have been established by clear proof. Such clear proof was found to be lacking in the case. The defendant now contends that no review or modification of this finding would be in order under the Supreme Court's remand, as clear proof remains the standard by which the UMW's "authorization, participation in, or ratification of" such an agreement must be established. This position would not appear tenable. While it is true that Justice White in his majority opinion for the Court stated: "In our view § 6 requires clear and convincing evidence only as to the Union's authorization, participation in, or ratification of the acts allegedly performed upon its behalf," the opinion likewise expressly stated: "The section neither expressly

nor by implication requires satisfaction of the clear-proof standard in deciding factual issues concerning the commission vel non of acts by union officers or by members alleged to constitute a conspiracy . . . ." Whatever "acts" may require clear and convincing proof under Section 6 of the Norris-LaGuardia Act as interpreted by the Supreme Court, it is clear that they do not include acts of union officers or union members in engaging in an antitrust conspiracy, secret or otherwise. There being no issue in this case but that John L. Lewis and other officers representing the UMW in all of the relevant negotiations with the BCOA were authorized representatives of the Union, this Court must accordingly weigh the evidence as it relates to the existence or nonexistence of an implied or secret conspiracy between the Union and the BCOA in accordance with the preponderance of the evidence rule normally applicable to civil antitrust lawsuits.

In this regard it must be noted that at one point in its former opinion this Court, in referring to the existence or non-existence of an implied conspiracy, stated: "Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the UMW did so impliedly agree" (265 F.Supp. 388 at 412). As appears from the opinion, this conclusion was stated by the Court in connection with the discussion of the PWC and at a time when the Court was in fact weighing the evidence under the clear proof rule and not under the preponderance rule. It is accordingly proper that the Court should reconsider its previously stated conclusion with a view to determining whether it is justified when the evidence is carefully considered in light of the preponderance standard of proof. Such a reconsideration is further required by an apparently conflicting conclusion arrived at by the Court in the concluding portion of its former opinion wherein the Court stated:

"While many inferences favorable to the plaintiffs' contentions can reasonably be drawn from the evidence, in every instance a no less equally reasonable inference can be drawn to the contrary. The latter, when coupled with the positive denial of many witnesses of any conspiracy, as well as other inferences favorable only to the defendant's contentions, do not permit a finding based upon clear proof of an antitrust conspiracy." (265 F.Supp. 388 at 432)

Apart from the plaintiff's contentions regarding the Protective Wage Clause and as hereinabove considered, there is no direct evidence in the record of a conspiratorial agreement between the UMW and the BCOA. As reflected by the record, every witness having personal knowledge of the negotiations and dealings between the UMW and the BCOA denied the existence of any agreement, secret or otherwise, wherein the Union conspired or committed itself to impose the wage and labor standards negotiated with the BCOA upon coal operators who were not members of the BCOA or who were not signatories to the contract negotiated with the BCOA. Making this denial were every officer and representative of the Union and every officer and representative of the BCOA who testified at the trial. Among the evidence now sought to be newly offered by the plaintiffs is the testimony of Mr. Moody. Even Mr. Moody, who as President of the Southern Coal Operators Association from 1946 to 1960 represented competitors of the BCOA in negotiations with the UMW, vehemently denies any such conspiracy. The statement in its former opinion that: "Every officer of the Union who testified, as well as every representative from the Coal Industry alleged to be in on the conspiracy, denied its existence." (265 F.Supp. 388 at 432) remains a correct statement.

Accordingly, if a conspiracy is to be found, it must be found in the reasonable inferences to be drawn from proven facts. That is, it must be inferred from the evidence.

The Court in its former opinion considered the various inferences that might be drawn from the various facts proven in the case. For example, the circumstances leading up to the 1950 National Contract and the changes that occurred at that time in the negotiating pattern followed by the Union are believed to be fully and correctly stated in the Court's previous opinion. The plaintiffs both then and now would have the Court infer from this evidence the beginning of an anticompetitive conspiracy between the Union and the major coal operators. The Court, however, has previously concluded:

"The Court can only say that upon the evidence to this point, it can discern no evidence of an incipient Sherman Act conspiracy. Certainly the testimony of the principal negotiators for both the Union and the operators is emphatic to the contrary. To conclude inferentially otherwise on the basis of the wage scale negotiated is to engage in unwarranted speculation and is to disregard the undeniable right of the Union to seek to gear its wage scale to the ability to pay of the soundly solvent and not the marginal producer . . . The circumstances of the negotiations as outlined above give no support in reason to such a conspiratorial inference. Rather, quite to the contrary." (265 F.Supp. 388 at 406 and 407).

Having now reconsidered the record under the preponderance rule, the Court can see no reason for altering these findings or conclusions.

Likewise, after recounting the evidence regarding the formation of the BCOA, the collective bargaining that occurred between 1950 and 1958 and the changes that occurred in the industry in these years, including the move to mechanization, the Court had these things to say:

"That these more peaceful procedures suggest a Sherman Act conspiracy, however, is not reasonably to be inferred . . . The economic pressure created by technological advances and the competition engendered thereby do not equate to a Sherman Act violation . . . The Court being unable to infer any Sherman Act conspiracy from the record to this point, these matters must accordingly be considered subsequently in the light of the total record." (265 F.Supp. 388 at 408, 409 and 410).

Again, having reconsidered the record under the preponderance rule, the Court can see no reason for altering these findings or conclusions.

Passing for the moment the former discussion of the Protective Wage Clause and turning to the evidence regarding the UMW's investments in the West Kentucky Coal Company and the activities of that coal company upon the TVA market, the Court again finds its former statement of the facts to be in accord with the record when viewed in the light of the preponderance rule. The Court there stated:

"The Court concludes that the evidence fails to establish that West Kentucky Coal Company or its subsidiary, Nashville Coal Company, engaged in predatory pricing of coal upon the TVA market. It rather appears that West Kentucky and Nashville based their prices upon legitimate business considerations and were attempting at all times to meet the competition, rather than lead the market downward. Having so concluded, it becomes unnecessary to consider further the responsibility of the U.M.W., if any, for West Kentucky and Nashville's coal pricing policies." (265 F. Supp. 388 at 422)

Likewise, the Court has again reviewed the record and its former findings as they relate to the Southeastern Tennessee coal field and the actions of the UMW regarding the plaintiffs in that coal field. After reciting the facts, the Court concluded:

"Upon this record the U.M.W. could not be held chargeable for the violence, even were the standard of proof required that of a usual civil case.

. . . Clear proof does not appear, either directly or by inference, that the U.M.W. acted other than unilaterally in furtherance of its own interests and purposes in its activities in the Southeastern Tennessee coal field in the period here under review." (265 F.Supp. 388 at 429–430)

The former statement of facts is believed upon review to be correct. Although the conclusion reached was weighed upon the clear proof scale, upon reweighing upon the preponderance scale the Court now arrives at the same conclusions.

There remains to consider the inferences to be drawn from the PWC as well as the inferences to be drawn when considering the record as a whole rather than in its component parts.

As previously found, the PWC did not by its terms commit the UMW to impose the wage and labor standards negotiated with the BCOA upon other coal operators with whom it might deal in the future. Did it by implication do that which it has been found not to have expressly done? Wherein does the evidence preponderate on this issue?

In its original opinion the Court in what it deemed to be dictum concluded that the preponderance rule would favor an inference that the PWC did by implication what it had not expressly done. The Court was motivated to such a finding by three considerations. One consideration was that thereafter the UMW did in fact negotiate contracts only upon the wage and labor standards set in the National Contract. Another consideration was that BCOA and its members did have a competitive motive, as evidenced by the PWC itself and its administration, to seek such a result. A third consideration was that complaints were in fact registered with UMW by signatory operators from time to time regarding the competitive advantage of non-signatory operators.

While each of these considerations remain persuasive with the Court, a careful review of the record would reveal other conflicting but equally persuasive considerations. While it is true that the UMW negotiated only upon the basis of the National Contract after the PWC was placed in the contract in 1958, it is also true that long prior to 1958, in fact ever since 1941, the Union had negotiated all contracts on the same flat across-the-board wage increases. Although wage differentials between northern and southern operators had been negotiated prior to 1941, it was the stated purpose of the Union from its inception to establish uniform wage and labor standards. As previously noted by the Court, "It appears clear from the evidence that national uniformity in wage rates and labor standards in the coal industry has been a consistent policy and goal of the UMW since its inception in 1890." 265 F.Supp. 388 at 404. A union is always in competition with non-union labor. It is apparent that the wage differentials negotiated prior to 1941 had the effect of placing the Union in competition with itself and that the Union sought consistently to avoid or eliminate these differentials.

As regards any inference to be drawn from a competitive motive on the part of BCOA, upon further reflection it is apparent that in a competitive economy a competitive motive will be universal to all coal producers. To draw an inference of antitrust conspiracy from this motive would be somewhat of an anomaly.

Finally, as regards the inference to be drawn from the registering of complaints of competitive disadvantage with the UMW by contract signatories, it is apparent that complaints of coal operators of competitive disadvantage were universal in their origin and included the plaintiffs themselves. Perhaps one operator best summed up the attitudes of all operators when at a bargaining session he stated: "All I want is a fair advantage." Collective bargaining inevitably involves the discussion of the competitive effect of wage and labor standards.

Although at the time the Court was weighing the inferences to be drawn from the PWC under the clear proof test it indicated a different result might follow were the preponderance rule to be applied, it is apparent upon careful review that the inferences to be drawn from the PWC are as consistent with unilateral action as they are with conspiratorial action and leave the Court to speculate in making the choice. Where equal inferences can be drawn and the Court is left to speculate, the plaintiffs have failed to carry their burden of proof. South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767 (6th Cir., 1970).

### Motion to Reopen Proof

■ Before undertaking a reconsideration of the evidence as a whole, as distinguished from its component parts as the Court has done to this point, it is appropriate that the Court should consider plaintiffs' motion to be allowed to reopen the proof in this case. In support of their motion the plaintiffs have made an offer of proof which consists of (1) the Minutes of the Joint Industry Contract Committee relating to the administration of the PWC by that Committee; (2) the deposition of Joseph E. Moody, President of the Southern Coal Producers Association from 1946 to 1960, together with the reports and minutes of that Association; (3) the deposition of Elmer C. Hill, Chief of the Fuels Procurement Branch of the TVA, who testified to the cancellation by West Kentucky Coal Company in 1965 of its long term coal sales agreements for the sale of coal to the TVA at the price of $2.90 per ton; and (4) stipulations entered in another lawsuit relating to the formation of the BCOA and including minutes of that Association and certain financial data. The Court has read and considered all of this evidence. Although voluminous, it is in very substantial measure cumulative to the proof offered upon the trial. The newly offered evidence offers no new theories of liability and presents no significant alteration of the evidence as presented upon the trial. The Court can envision no injustice in declining to reopen the trial. In view of the very extensive trial upon the issues, the substantially cumulative nature of the newly tendered proof, and the directions upon remand in this case, the Court is of the opinion that the motion to reopen the proof should be denied.

### Conclusions

Having made a re-evaluation under the preponderance rule of the evidence as it relates to the various component allegations of the antitrust conspiracy herein sued upon, there remains to be accomplished a re-evaluation of the evidence when viewed as a whole and in its totality. Reviewing its former findings and conclusions in this regard and reviewing each in the light of the preponderance rule and in view of a restudy of the full record, the Court can find no justification for changing those findings or conclusions as set forth in 265 F. Supp. 388 at 431–435. The Court can only conclude that the evidence weighs no less equally in favor of a unilateral action on the part of the Union than it does in favor of conspiratorial action on the part of the Union.

The plaintiffs emphasize certain matters which they deem not to have been properly weighed or evaluated in the Court's original opinion. Among these are the totality of the UMW–BCOA negotiations, including changes in bargaining that occurred in 1950 and the PWC in 1958; the "price-wage squeeze" as evidenced in the UMW–West Kentucky Coal Company relationship, and the totality of the evidence as it relates to the ruinous conditions that developed in the late 1950's and early 1960's in the Southeastern Tennessee coal fields.

As regards the totality of the evidence and the plaintiffs' contentions of a UMW–BCOA antitrust conspiracy, apart from what has been said in this or its former opinion, the Court is of the opinion that the most that can be said without engaging in impermissible speculation is that the motives of the UMW and

the motives of the BCOA do appear to have coincided. The Union was motiviated to seek higher uniform wages and welfare benefits for its members. The BCOA was motivated to seek protection for its members from lower wage competition. A coincidence of motives does not of itself connote a Sherman Act conspiracy, nor does it make unilateral action to achieve these goals conspiratorial. Otherwise every employer and every union signing a collective bargaining agreement might well find themselves unavoidably exposed to an antitrust charge. A similar coincidence of motive can be found in almost every such situation, particularly where the industry is highly competitive and the union possesses any multi-employer bargaining strength. Moreover, in every competitive industry there are always marginal operators to whom any wage increase may be ruinous.

As regards the UMW–West Kentucky Coal Company relationship and activities, there can be no doubt but that the Union's financial and investment activities as they relate to that Company are deserving of the most critical censure. But whatever the Union's purpose or purposes were in making those investments, the evidence does not sustain the inference that they were for the purpose of an anti-competitive effect on the Southeastern Tennessee coal field or that they exemplified a union-industry antitrust conspiracy. As previously found by the Court, not only does the evidence fail to establish predatory pricing of coal upon the TVA market by the West Kentucky Coal Company, but there is an absence of any evidence of union participation in or responsibility for the pricing of coal by that Company.

As regards the totality of the evidence of union activities in the Southeastern Tennessee coal field, these matters are believed to have been correctly stated and evaluated by the Court in its former opinion (265 F.Supp. 388 at 423–435).

While, as recognized by the Court in its former opinion, many factors contributed to the plight of the plaintiffs, including some of which they were themselves the author, there can be no question but that the Union's actions and activities during the period relevant to this lawsuit did in substantial measure occasion loss to the plaintiffs. However, injurious consequences, while an element of a Sherman Act violation, do not of themselves equate to such a violation. Rather, as stated by Justice White in the *Pennington* case (381 U.S. 657 at 665, 85 S.Ct. 1585 at 1591, 14 L. Ed.2d 626):

> "Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union. The union need not gear its wage demands to wages which the weakest units in the industry can afford to pay. Such union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional direct or indirect evidence of the conspiracy."

There is an absence of direct evidence of a conspiracy in this case. For the reasons stated in this and its former opinion, the Court is of the opinion that there is an insufficiency of indirect evidence to establish a conspiracy, even when viewed in light of the preponderance of the evidence rule. With such modifications and additions as are herein set forth, the Court adopts its former opinion in this case.

An order will accordingly enter dismissing the lawsuit.