**SMITTY BAKER COAL CO., INC., Plaintiff,**

v.

**UNITED MINE WORKERS of AMERICA, Defendant.**

Civ. A. No. 73–C–51(A).

United States District Court, W. D. Virginia, Abingdon Division.

Aug. 24, 1978.

Joseph E. Wolfe, Jonesville, Va., Claude K. Robertson, Knoxville, Tenn., for plaintiff.

E. H. Rayson, Knoxville, Tenn., Stuart B. Campbell, Wytheville, Va., Montie S. Meeks, Norton, Va., for defendant.

## MEMORANDUM OPINION

TURK, Chief Judge.

This civil action serves to turn the page on yet another installment to the series of cases dealing with the relationship between the United Mine Workers of America and certain of the major national coal producing companies. Plaintiff originally filed the action on April 16, 1973, seeking relief under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and under the Labor Management Relations Act, 29 U.S.C. § 158. The complaint also set forth a common law action for breach of contract. While plaintiff complained of an illegal conspiracy between the United Mine Workers of America and several major coal producers represented by the Bituminous Coal Operators Association, only the United Mine Workers of America was named as a party defendant. The case was eventually tried to a seven member jury in November of 1975. At the close of all the evidence, plaintiff was permitted to take a voluntary dismissal with prejudice as to the labor law and the breach of contract claims. The antitrust claim was submitted to the jury by way of a special verdict form. Stated briefly, the court called upon the jury to determine whether the defendant had entered a conspiracy to monopolize trade; whether the conspiracy as regarded plaintiff was authorized or ratified by defendant's governing body; and whether the plaintiff had been injured as a direct and proximate cause of such conspiracy. The jury answered each question in the affirmative and assessed damages at One Million Two Hundred and Fifty Thousand Dollars ($1,250,000.00). Assigning numerous grounds of error and insufficiency, defendant filed its motion for judgment notwithstanding the verdict, or in the alternative, motion for a new trial.[1] Before proceeding

---

1. In its response to defendant's motion for judgment n. o. v. plaintiff argues that defendant is precluded from raising certain grounds in support of the motion inasmuch as those

to consideration of defendant's motion, the court will undertake a review of the facts of the case and the contentions of the respective parties.

## I

The plaintiff, Smitty Baker Coal Co., Inc. (Smitty Baker), was incorporated under the laws of Virginia in 1969. Operating in Lee County, Virginia, Smitty Baker undoubtedly qualifies as a small, family owned coal company whose activities were limited to the mining and selling of coal. At the time of its incorporation and at all relevant times thereafter, the sole stockholder in the company was one Smitty Baker. However, the driving force behind the formation of the company was provided by Smitty Baker's father, Ralph Baker, who, throughout the events that were to unfold, served as the company's general manager. Ralph Baker, a coal miner for many years, ran the company's day to day operations and acted as the company's representative in dealings with the company's employees. At the time Smitty Baker began its operations, almost all the coal land in Lee County was controlled by Peabody Coal Company, one of the largest coal producers in the United States. On August 1, 1969, Smitty Baker obtained a lease from Peabody Coal Company for coal lands located in Saint Charles, Virginia. Smitty Baker undertook underground mining operations on that property and later on a second, adjacent tract, pursuant to a second lease agreement with Peabody executed on March 1, 1970. Most of the coal produced was sold to the Tennessee Valley Authority, at first on the spot market and later under a one year contract which provided for purchase of two thousand tons per week. As the operation progressed, plaintiff purchased two continuous miners which obviously were intended to increase production through mechanization.

By 1971, Smitty Baker employed approximately thirty individuals.

Ralph Baker testified that as a condition for obtaining the company's two leases from Peabody, he had been compelled to enter into the National Bituminous Coal Wage Agreement of 1968 with the defendant United Mine Workers of America (UMW). The 1968 contract was scheduled to expire as of September 30, 1971. On October 1, 1971, a strike by the UMW members commenced due to the failure of negotiators to settle on terms for a new contract. Ralph Baker testified that he was not provided with adequate notice of the termination of agreement as per the terms of the 1968 contract. While Baker had become aware of the imminent strike through the media and discussions with his employees, the question of notice is not now relevant in and of itself, inasmuch as plaintiff has abandoned its claim under the National Labor Relations Act. In any case, as of October 1, 1971, Smitty Baker was embroiled in the nationwide coal strike. It is undisputed that the Smitty Baker operation was showing modest profits prior to the strike. Ralph Baker testified that, in anticipation of a work stoppage which could have been expected to endanger Smitty Baker's performance on the TVA contract, he offered to sign a stipulation binding the company to retroactive adoption of any new 1971 Wage Agreement on the condition that his employees not participate in the strike.

Initially, Ralph Baker attempted to reach some agreement with E. B. Clark, field representative of UMW District 28 of which plaintiff's employees were members. Clark refused to permit his members to assist in the production of coal though he did allow the members to assist in "dead work" (maintenance of the mines during the inactive period). Soon thereafter, picket lines

grounds were not specifically stated in defendant's motion for a directed verdict at the close of all the evidence. See Rule 50(b) of the F.R.Civ.P. While the court's disposition in this case does not turn on the rejection of plaintiff's procedural challenge, it is the court's opinion that all the grounds now advanced by defend-

ant were raised in the motion for directed verdict at the close of plaintiff's evidence and were effectively renewed by specific reference in defendant's motion at the close of all the evidence. See 9 *Wright and Miller, Federal Practice and Procedure*, § 2534 at 588 (1971).

were established. Apparently, no UMW workers crossed the picket lines even to do dead work. When Baker once again attempted to get some assistance through Clark, he met with what he considered to be the unsatisfactory response to the effect that workers would not be ordered across picket lines. On or about November 1, 1971, Baker, acting on the advice of an attorney, notified his employees by letter that they would be replaced if they did not return to work by November 10, 1971. No workers returned.

On November, 13, 1971, the Bituminous Coal Operators Association (BCOA) and the UMW agreed on the terms of a new contract. However, Baker testified that he did not find out about the new agreement until November 16, 1971. As per longstanding policy as will be discussed *infra*, the UMW's normal practice was to secure the participation of small, independent operators such as Smitty Baker sometime shortly after the contract had been successfully negotiated with the group of coal operators represented through the BCOA. However, on November 15, 1971, Ralph Baker had committed Smitty Baker to a contract with the Southern Labor Union (SLU). Smitty Baker resumed its operations under a SLU contract with ten men. The men worked on November 15 and November 16, producing a small quantity of coal. On November 15, field representative Clark appeared at Smitty Baker's offices with the terms of the new UMW contract. Clark suggested that Baker sign a stipulation to be bound by the new contract (which had not yet been printed), thus permitting resumption of work by UMW members. When told that Smitty Baker had signed with the SLU, Clark threatened a National Labor Relations Board investigation and left. Soon thereafter, the number of pickets at the Smitty Baker mining site increased. Later that afternoon, several incidents of violence occurred at the picket lines when Smitty Baker's SLU employees left for the day. Ralph Baker testified that his life was threatened. The SLU employees did not return to work the next day or at anytime thereafter. Despite Baker's continued efforts to obtain

Clark's permission for the performance of dead work, no further labor was undertaken at the Smitty Baker operation.

Counsel for UMW District 28 later initiated the NLRB charge for unfair labor practice. A NLRB representative undertook an investigation. Sometime in early December, the investigation terminated when the UMW dropped its charge and the SLU abandoned its claim as the bargaining agent for Smitty Baker's employees. On December 13, 1971, the NLRB called Ralph Baker's home and informed Baker's wife that all charges had been dropped. Since Smitty Baker's first lease with Peabody was about to expire, Ralph Baker called Peabody and informed its representative that the NLRB charges had been dropped and that Smitty Baker wished to renew the first lease. The Peabody agent, Charles Selvey, replied that he and Clark would visit Baker to discuss the matter.

On December 15, 1971, field representative Clark and Selvey appeared at plaintiff's offices. Baker testified that he was told that the lease would not be renewed until Smitty Baker accepted the 1971 UMW contract. Baker expressed reluctance to take any action until he had firm indication that the NLRB charge had actually been dropped. Clark then put in a telephone call to the NLRB office. The NLRB representative verbally informed Baker that the matter had been resolved. Nevertheless, Baker declined to sign any papers until formal notification as to the disposition of the charges was received.

On December 17, 1971, Baker met with the local mine committee and union officers. He informed the group that Smitty Baker would execute a stipulation to abide by the terms of the 1971 contract if his employees would resume work. The formal adoption of the new contract was to occur when official NLRB notification was received, with the further proviso that the workers could go back on strike if the NLRB confirmation did not arrive within thirty days. Baker conveyed his concern that the company would go under if work were not resumed forthwith. The employ-

ees related that they would take the matter up with Clark. While Clark and Baker were in contact the next day, they were unable to reach any accord. Clark maintained that he had offered Baker such a stipulation back on November 16, 1971 and that he then offered the contract itself. Baker was apparently still concerned over a possible conflict if he actually signed the contract prior to receipt of some formal notification from the NLRB regarding the resolution of the unfair labor practice charge. Clark was reluctant to approve work resumption based on anything short of Smitty Baker's unequivocal acceptance of the new contract. Clark did agree to consult with District 28 counsel S. Strother Smith, concerning the stipulation proposed by Baker. On December 19, 1971, Clark called Baker to report that Attorney Smith could not be located. Baker replied that he was turning the matter over to the company's attorney.

On December 23, 1971, the controversy appeared to be headed toward a solution. Baker, Clark, Attorney Smith, and several UMW members met with Baker at plaintiff's offices. An arrangement was reached whereby a quantity of coal on the yard was transported and sold, with the proceeds paid out to the employees as a Christmas bonus. After the meeting, several proposals were exchanged between the respective attorneys. At some point, the company spokesman indicated that it was no longer possible for the plaintiff to operate under the wage scale established under the 1971 contract. The union's attorney's request to examine the company's books was refused. The union, through Attorney Smith, suggested resumption of operations under the 1971 contract with a rider providing for renegotiation if the operation proved financially unfeasible. The company, by counsel, offered, as a counterproposal, a new contract which included lower wage and royalty scales. On January 13, 1972, Attorney Smith suggested another meeting but no further contract negotiations took place.

Contemplating that further negotiations would take place, Ralph Baker reached an agreement with several of his employees providing for the performance of dead work. The agreement was approved by the local committee and the union. However, upon attempting to reopen one of the two mines, the workers discovered a rock fall. Ralph Baker estimated that at that point, the cost of reopening either mine was prohibitive, given plaintiff's depleted financial resources. In March, plaintiff's leasehold interests, equipment, and other assets on the mine site were sold to P & P Coal Company.

## II

In its complaint, plaintiff contended that its financial demise was caused by actions taken by the UMW pursuant to an illegal conspiracy between the UMW and certain of the major national coal producers. At trial, plaintiff adduced voluminous evidence and testimony directed to the background and history of the alleged conspiracy. Given the court's disposition in this case, a systematic review of all the documentary evidence concerning the history and development of the conspiracy is not necessary. However, a statement of the positions of the parties, as developed at the trial, serves as a logical introduction to the legal issues considered herein. Given the current status of the case, the court will devote particular attention to the positions advanced by plaintiff.

In the period after World War II, the coal industry in this country was experiencing many problems which stemmed primarily from chronic overproduction. Plaintiff contended that both the UMW and the major coal operators came to recognize the proliferation of small coal operators as a contributing, if not dominant cause of the overproduction. The UMW had originally sought to remedy the problem through a system of allocation of work time and reduction of the work week. At the same time, the UMW was applying flexible wage scales, based on sectional and production unit variations, designed to keep employment levels high by making the smaller operations more competitive. Obviously, the large coal produc-

ers were dissatisfied with any arrangement whereby nonrecoverable production costs were incurred due to loss of work time and idle machinery. The large producers feared that with the inevitable increase of cost, their coal would lose its competitive position in the fuel market confrontations with oil and gas. At the same point in time, the UMW was in the midst of its attempt to develop its infant pension and welfare program. The UMW's design for more standardized and progressive wage scales was also endangered by the general blight suffered by the industry.

These conflicting considerations converged as the UMW and the coal producers undertook negotiations for a new collective bargaining agreement in 1950. When the new contract was adopted, the operators and the union found themselves in uncharacteristic accord. The UMW had abandoned its attempts to maintain competition between the larger and smaller units through work allocation and reduced work weeks. Thus, the larger coal producers could more fully mechanize and cut costs. The new policy would obviously take its toll in the number of jobs available to UMW members. However, the contract also provided for the UMW's cooperative control over the welfare fund. A bargain had been struck.

Also in 1950, the Bituminous Coal Operators Association was formed. Plaintiff has contended that an understanding was reached between the UMW and the major coal producers represented by the BCOA to the effect that the union would not negotiate or adopt any form of contract other than those negotiated between the union and the BCOA in the successive amendments to the agreement of 1950. Plaintiff asserted that the major producers and the UMW thereafter undertook to negotiate contracts and wage scales which were ruinous to the small operators who could not afford to mechanize. Plaintiff urged that the inevitable result was a decrease in production units which eased the problem of overproduction. It follows that as their profits increased, the larger producers found themselves in a position to sustain the higher wage scale increments embodied in the successive contracts. In the years that followed, the UMW also undertook an extensive campaign to organize workers in traditionally non-union areas. Plaintiff maintained that such effort was consistent with the goals of a conspiracy, i. e., the elimination of minor producers who operated outside the UMW contract and who could produce cheaper coal, thus endangering the markets of the UMW's large co-conspirators.

Plaintiff contended that the 1958 contract included a provision which constituted a direct manifestation of the illegal conspiracy. The provision, styled as the Protective Wage Clause (PWC), set forth certain reciprocal commitments between the UMW and the signatory operators. Under Paragraph B of the PWC, the signatory operators agreed that any coal mined, produced, prepared, procured, or acquired by such signatory operators would be mined under labor standards as favorable as those set forth under the 1958 contract. Simply stated, such provision served to limit the potential market for coal produced by non-union operators. Paragraph B also included a "Coal Lands Clause," which constituted an agreement by the signatory operators not to lease coal lands to any operators who did not participate in the 1958 agreement. Under Paragraph A of the PWC, the UMW committed itself to uniform application of the terms of the 1958 contract. Interpretation of Paragraph A has been the subject of several court cases tried under a conspiracy theory. The plaintiff contended that the provision required the UMW to impose the national contract on all operators subsequently organized by the union. The UMW has consistently asserted that the requirement was limited to a uniform application of the contract provisions only as to signatory operators and that the paragraph held no implications as to the UMW's relationship with non-signatories. In *Lewis v. Pennington [Pennington II]*, 257 F.Supp. 815 (E.D.Tenn., 1966), aff'd 400 F.2d 806 (6th Cir., 1968), *cert. denied* 393 U.S. 983, 89

S.Ct. 450, 21 L.Ed.2d 444 (1968)[2], the district court, in a non-jury trial, adopted the UMW's interpretation. The same interpretation prevailed in *Ramsey v. UMW [Ramsey II]*, 344 F.Supp. 1029 (E.D.Tenn., 1972), aff'd 481 F.2d 742 (6th Cir., 1973), *cert. denied* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 473 (1973)[3], another non-jury case. However, the PWC has been uniformly viewed by the courts as ambiguous on its face, and thus, in jury trials, the interpretation of Paragraph A has been held a proper question for submission to the jury. In *Tennessee Consolidated Coal Co. v. UMW*, 416 F.2d 1192 (6th Cir., 1969), *cert. denied* 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970), a jury verdict, which adopted the same interpretation advanced by the instant plaintiff, was upheld.[4]

The PWC was short-lived. The Landrum-Griffin Act of 1959 cast doubt on the legality of the "boycott" provisions of Paragraph B of the PWC. Enforcement of Paragraph B was therefore suspended on November 4, 1959 by the Joint Industry Contract Committee, a group of union and industry representatives charged under the 1958 contract with responsibility for enforcement of the PWC. The PWC was not included in the national contract of 1964.

Plaintiff contended that while the formal provisions of the PWC were eliminated from the later national contracts, the spirit of its conspiratorial design lived on through mutual agreement between the UMW and the major operators. As a further manifestation of this conspiratorial intent, plaintiff directed attention to the Eighty Cent Clause which supplanted the PWC in the

national contract of 1964. Briefly stated, the Eighty Cent Clause required signatory operators to pay twice the welfare deduction on coal acquired from non-signatory subcontractors as that paid on coal produced under the contract. See gen., *Riverton Coal Co. v. UMW*, 453 F.2d 1035 (6th Cir., 1972), *cert. denied* 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972). Thus, coal produced by non-signatories became financially unattractive. As further evidence of the continuance of defendant's conspiratorial motive, plaintiff contended that Paragraph A of the 1958 contract was never expressly negated in subsequent contracts. Finally, plaintiff asserted that the Coal Lands Clause of the 1958 contract was maintained in subsequent contracts.

In summary, plaintiff tried the case to the jury on the theory that the UMW and several major coal producers have engaged in a continuing conspiracy to monopolize and restrain trade in the coal industry by eliminating competition from the small, independent producers for the benefit of the major producers. Plaintiff asserted that the conspiracy found form in the progressively harsh contractual terms embodied in the national contracts negotiated by the BCOA and UMW after 1950. Plaintiff urged that the 1958 and 1964 contracts included provisions which were specific manifestations of the conspiracy. As to its particular situation, plaintiff alleged that Peabody Coal Company's insistence that plaintiff accept UMW organization as a condition for the lease of coal lands and the UMW strike of 1971 were further manifestations of the conspiratorial effort to mo-

**2.** The *Pennington* cases were the first in the series. In *Pennington v. UMW*, 325 F.2d 804 (6th Cir., 1963), the court upheld a jury verdict against the UMW. The United States Supreme Court reversed in *UMW v. Pennington [Pennington I]*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), thus setting the stage for *Pennington II*.

**3.** In *Ramsey v. UMW [Ramsey I]*, 265 F.Supp. 388 (E.D.Tenn., 1967), aff'd by an equally divided court 416 F.2d 655 (6th Cir., 1969), the trial court had applied a "clear proof" standard in finding the absence of an antitrust violation. The United States Supreme Court reversed,

holding that the proper standard was that of *preponderance of the evidence*. 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). On remand, the trial court, applying the preponderance standard, once again found the absence of a conspiracy.

**4.** A plaintiff's verdict was also upheld in *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767 (6th Cir., 1970), *cert. denied* 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971). However, the factual situation in *South-East* differed significantly from that of the instant case.

nopolize the coal industry to the disadvantage and financial ruin of smaller operators such as plaintiff.

At trial, defendant contested all the allegations concerning its participation in an illegal conspiracy. Defendant's evidence was to the effect that, in the period in question, its collective bargaining efforts were directed towards legitimate objectives which were deemed to be in the best interests of its members. Moreover, defendant argued that it has sought those objectives in arm's length negotiations, pursuant to its own policies, and not in an effort to benefit any one or group of the operators with which it bargains. Consequently, the defendant urged that its conduct in contract negotiation was protected under labor's exemption from the antitrust laws as provided by the Clayton Act and Norris-LaGuardia Act.

### III

In its motion for judgment n. o. v., defendant argues that plaintiff's proof was fatally defective on two grounds. The UMW contends that there is insufficient evidence to sustain the jury's verdict that defendant entered into an illegal conspiracy. In the alternative, defendant maintains that even if the conspiracy question was properly submitted to the jury, there is insufficient evidence demonstrating that the damages sustained by plaintiff were caused by such conspiracy.

The court has determined that the evidence was sufficient for the jury to infer that a conspiracy did exist between the UMW and certain of the major coal producers. In an almost identical factual situation, the United States Court of Appeals for the Sixth Circuit found the conspiracy evidence to be sufficient to create issues of fact. See *Tennessee Consolidated Coal Co. v. UMW, supra.* Stated on its face, the Protective Wage Clause of 1958 can only be viewed as highly ambiguous. Given the surrounding facts, circumstances, and general background of the PWC, the interpretation of its meaning and intended purpose must be deemed to have been a factual question which was properly presented to the jury. Moreover, the court must conclude that the evidence was such that the jury might have reasonably inferred that the Eighty Cent Clause was formulated as an alternate means for accomplishment of the underlying purpose of the PWC. In short, the court has concluded that reasonable men could have differed as to the existence of the alleged conspiracy. Accordingly, defendant's motion for judgment n. o. v. on that ground must fail. However, after a thorough and detailed evaluation of the evidence of record, the court is constrained to conclude that there was insufficient evidence for the jury to find that the plaintiff's injuries were suffered as a direct and proximate cause of the conspiracy.

The court does not reach such a conclusion lightly. There can be no doubt that judgment n. o. v. is properly granted only under the most unusual circumstances. In such a situation, the court may not reweigh the evidence nor may it pass on the credibility of the witnesses. The court is not free to substitute its judgment as to the proper resolution of the facts. Rather, the court is limited to a strict determination as to whether there was but one conclusion as to the verdict that reasonable men could have reached. See *Simblest v. Maynard*, 427 F.2d 1, 4 (2nd Cir., 1970). In making its determination, the court must view the evidence in a light most favorable to the party against whom the motion is made and it must credit that party with all reasonable inferences that might be drawn from the evidence. See, gen., 9 *Wright and Miller, Federal Practice and Procedure*, § 2524 at 541 *et seq.* (1971).

The court is also cognizant of the proposition that the question of causation in actions arising under the Sherman Act cannot, by necessity, be viewed with the same exactitude as might normally be the case. As stated by the United States Supreme Court in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962),

In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. "[T]he duty of the jury was to look at the whole picture and not merely at the individual figures in it." *American Tobacco Co. v. United States*, 147 F.2d 93, 106 (6th Cir., 1944), aff'd 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Obviously, in considering a motion for judgment n. o. v., the court cannot adopt a different standard of evaluation than that imposed on the jury. Moreover, the proof of causation in an antitrust case is not bound to a narrow and precise standard. In *Bigelow v. RKO Radio Pictures Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946), the Supreme Court noted as follows:

> [I]n the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiff's business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

▆ It is equally true that the mere fact of defendant UMW's participation in a conspiracy does not serve in itself to establish plaintiff's right to recovery. Plaintiff had the burden to establish the causal link between defendants' illegal conduct and the damage that was eventually suffered. Furthermore, the standard of proof required to establish the causal relationship differs to some extent from the more liberal standard applied in antitrust cases for measuring damages. As the Supreme Court stated in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931),

> [T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

It was unnecessary for plaintiff to have established that the illegal actions of defendant were the only cause, or even the most substantial cause of its injuries. Yet, plaintiff must offer sufficient proof that defendant's illegal conduct materially contributed to the injury. See *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 20 (5th Cir., 1974), *reh. denied* 496 F.2d 878 (5 Cir., 1974), *cert. dismissed* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974); *Haverhill Gazette Co. v. Union Leader Corp.*, 333 F.2d 798 (1st Cir., 1964), *cert. denied* 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964). With such understanding of the relevant standards, the court proceeds to consideration of the matter of causation in the instant case.

▆ At the outset, the court must note the striking variance between the thrust of the evidence of conspiracy as advanced by plaintiff and the theory of causation presented by plaintiff in support of its own recovery of damages. Plaintiff's evidence, as regards the conspiracy, was directed to a showing that the UMW and certain of the major coal producers have attempted since 1950 to force smaller operators out of business. Plaintiff's evidence suggests that the goal of the conspiracy was implemented in one of two ways, depending on whether the small operator was or was not a signatory to the national contract. If the operator was a signatory, the desired end was achieved through increasingly burdensome national contracts. If the operator was a non-signatory, the destruction of its business was effected through partial market exclusion in the form of the Protective Wage Clause and, later, the Eighty Cent Clause. Under plaintiff's theory, any lapse between the two prongs of the conspiracy was covered by the Coal Lands Clause which precluded the leasing of coal lands by signatory operators to non-signatory operators.

There is absolutely no evidence of record from which the jury could have possibly inferred that plaintiff's financial losses were caused by actions taken by defendant pursuant to such a conspiracy. From its inception in 1969 until its demise in 1971, plaintiff worked under a UMW contract. Obviously, plaintiff was never subject to a total or partial market exclusion, prompted by actions of the defendant or otherwise. Thus, the second prong of the conspiracy simply did not apply to this plaintiff's situation. Furthermore, it is undisputed that while operating under the 1968 UMW contract, plaintiff's operation demonstrated an increasing, albeit moderate profit margin. Indeed, during 1970 and early 1971, plaintiff undertook general mechanization of its operation with the full expectation of increased profits. The 1968 contract can in no way be viewed as having been ruinous to plaintiff's business. Moreover, it is plaintiff's general manager's undisputed testimony that even before the strike of 1971, he was willing to bind plaintiff to *whatever* contract was eventually negotiated between the UMW and the BCOA. Even after the strike had begun and as late as December 17, 1971, the general manager was still anxious to sign a stipulation agreeing to be bound by the 1971 contract. While the UMW may well have been involved in a conspiracy to drive small operators out of business through unrealistic wage demands, all the evidence establishes beyond any question that such a conspiratorial tactic in no way contributed to this particular plaintiff's total financial destruction. Indeed, in its evidence relative to the measure of damages, plaintiff undertook to demonstrate that it would have made millions in future profits had it continued to operate, even under the 1971 contract. This evidence, and the fact of plaintiff's willingness to accept the 1971 contract even before the contract's wage terms were established, is totally inconsistent with the notion that plaintiff was the victim of a conspiracy implemented by the UMW's unrealistic wage and royalty requirements. There is no evidence upon which the jury could have even remotely inferred that such was the case.

As relates to causation, this case is totally unlike the line of cases following *Lewis v. Pennington, supra,* in which damages were alleged to have been incurred, in part, through the small operators refusal or inability to perform under the national contract. In this case, the damage of which plaintiff complains, i. e., disruption and eventual destruction of business during the 1971 national coal strike, can simply not be attributed to any of the direct manifestations of the conspiracy which have served to establish at least a question of fact as to causation in the earlier sister cases. In the face of this obvious shortcoming, plaintiff has raised an ingenious theory of causation to which the court now directs its attention.

Plaintiff starts with the observation that, pursuant to the conspiracy, Peabody Coal Company forced plaintiff to accept the 1968 UMW contract as a condition for leasing coal lands to plaintiff. Plaintiff goes on to assert that, had it not been involved with the UMW, it would not have become embroiled in the 1971 national coal strike. Plaintiff reasons that since its financial collapse was obviously caused by the operation of the strike, which was maintained by force, the requisite causal connection could have reasonably been inferred by the jury. However, the unassailable fact is that the plaintiff's demise was directly attributable to factors completely beyond the influence or control of the UMW.

As noted above, plaintiff was performing at a profitable level prior to the national coal strike of 1971, having opened two mines since its inception in 1969. The purchase and installation of two continuous mining machines had increased production. At about the time of its purchase of the second machine, plaintiff had executed a contract for sale of coal to the Tennessee Valley Authority, thus assuring a regular market for at least two thousand tons a week. However, as of October 1, 1971, plaintiff closed operations as a result of the strike. A new contract was negotiated on November 13, 1971 and most companies, including the small operations, were back

on full production a few days thereafter. Even prior to the strike, plaintiff's general manager had expressed willingness to adopt the new 1971 contract without any knowledge of what the new terms would be. What had gone wrong?

Plaintiff has consistently asserted that its mining business was destroyed by the UMW's refusal to permit workers to do the crucial dead work necessary to keep underground mines operational during periods of inactivity. The undisputed testimony is that the termination of business in early February of 1972 was necessitated by the general deterioration of plaintiff's two mines which could probably have been prevented had the dead work been done. It is also undisputed that from the beginning of the strike until at least November 15, 1971, plaintiff's place of business was picketed, as were many other mining operations in the same area. On the morning of November 15, 1971, plaintiff signed a contract with the Southern Labor Union. The jury could have only found that, at that point, the condition of plaintiff's mines had not deteriorated beyond the point of no return, inasmuch as plaintiff's general manager personally testified that coal was produced under the Southern Labor Union contract on November 16, 1971.

The legality of plaintiff's participation in the Southern Labor Union contract is not before the court. However, the impact of plaintiff's participation can be subject to only one interpretation: plaintiff's unilateral action in signing the contract was the sole cause of plaintiff's financial demise. There is absolutely no evidence from which the jury could have reasonably found that plaintiff felt compelled to execute the Southern Labor Union agreement for fear the UMW's 1971 contract would be too harsh. As previously noted, plaintiff's general manager had attempted to bind the company to the new agreement before the terms were ever drafted. The general manager testified that he signed the Southern Labor Union contract before he had knowledge that the new UMW agreement had been finalized. Obviously, there is no evidence from which the jury could have

found that plaintiff signed with the rival union in reaction to the terms of the new UMW contract.

At this point, it is also relevant to note that the record contains absolutely no evidence, either direct or indirect, suggestive of the implication that the 1971 UMW strike was, in itself, part and parcel of an illegal conspiracy. The strike was uniformly enforced as to all employment units organized by the UMW, large and small alike. Plaintiff can scarcely be heard to argue that the UMW's refusal to allow plaintiff to continue to operate, under a mere stipulation to be retroactively bound to the new agreement, was a manifestation of a conspiracy to drive small operators out of business. The integrity of a nationwide industrial strike could not be maintained if such variations were allowed to prevail. Moreover, there is no evidence from which the jury might have found that the UMW, or any of its members, employed violence at the picket lines in an attempt to implement the goal of an illegal conspiracy. While there was evidence suggesting that violent confrontations between the UMW pickets and the SLU laborers served permanently to drive the SLU employees away from the mine site, there is insufficient evidence from which reasonably to infer that such violence was directed toward any goal more sinister than protection of the effectiveness of the strike.

Even if the jury did find the strike itself to be a manifestation of the conspiracy, there is still no evidence from which reasonable men could have found that plaintiff's total and complete financial collapse was caused by the strike. Predictably, plaintiff's agreement with the Southern Labor Union led to increased picketing of the work site by members of the UMW. Given the circumstances, it was not to be unexpected that the UMW filed an unfair labor charge with the National Labor Relations Board. Yet, when told in mid December that the unfair labor charge was being dropped, plaintiff's general manager unilaterally opted not to go back to work. The reason, at that point, was not that the

UMW contract would be ruinous to plaintiff's business. Rather, the general manager insisted that he be provided a *written notification* by the NLRB that the charges had been dropped, despite the fact that an NLRB representative specifically told the general manager on the phone that the charges had been withdrawn. On December 17, 1971, the general manager, in a direct proposal to his employees, again offered a stipulation to be bound by the 1971 contract if his employees would work until written notification was received from the NLRB. At that point, plaintiff's general manager obviously did not feel that either the mine condition or the general financial situation had deteriorated beyond the point of no return. Surely, the UMW could not be charged with having had any knowledge to the contrary.

At later meetings in early January, plaintiff, now represented by counsel, stated an inability to perform under the terms of the 1971 contract. Contrary to the entire thrust of the conspiracy as presented by plaintiff, the UMW's representative expressed a willingness at least to discuss modifications, if plaintiff would allow examination of its financial records. Even when this request was refused, the UMW representative suggested that work be resumed under the 1971 contract with a rider providing for renegotiation if the terms of the agreement proved financially unreasonable. Finally, it must be noted that in February of 1972, when it was discovered that the mines had definitely deteriorated beyond plaintiff's capability for repair, the men who made the discovery were UMW members who had been permitted by the union to do dead work even though plaintiff had not signed the contract.

In summary, the only conclusion that reasonable men could have reached was that plaintiff's damages and financial failure were caused by the chain of events initiated by plaintiff's general manager's adoption of the Southern Labor Union contract. The mines were workable at the time the contract was signed, as evidenced by the production of the SLU laborers. Beyond any doubt, the failure of subsequent negotiations between the UMW and plaintiff was caused by plaintiff's general manager's intractable stance. It is no answer for plaintiff to assert that its troubles would never have occurred had it not been forced, pursuant to the conspiracy, to execute the UMW agreement when it obtained its initial coal leases. Considering all the evidence in its totality, such a circumstance had absolutely no tendency to injure this particular plaintiff's business. See *Bigelow v. RKO Pictures, Inc., supra.* Plaintiff failed to adduce any evidence from which the jury could have possibly found that the illegal conspiracy was even a partial cause of plaintiff's losses. Plaintiff's theory of causation is utterly fantastic, even considering the liberal approach generally adopted in defining an antitrust plaintiff's burden of proof. The court is unaware of any case law which even remotely suggests that damages may be recovered in an antitrust action, based on such a remote and imprecise showing of causal connection.

The crux of this case boils down to a very simple proposition. If plaintiff's theory of causation were to prevail, the defendant union would become the insurer of the financial success of every small operator who performs under the national contract.[5] Assuming plaintiff had signed the 1971 contract, it would be just as reasonable under such a theory of causal connection for plaintiff to have come to court alleging inability to perform under the "ruinous" contract each and every time market conditions became unfavorable. While the jury could have reasonably found that Peabody Coal Company forced plaintiff to sign with the UMW as per the design of the conspiracy, plaintiff must still be required to demonstrate that the injuries actually suffered were caused directly by some action of the

---

5. It must be remembered that the conspiracy was alleged to have been designed in such a manner as to force small operators to either enter the national agreement or terminate their businesses. Thus, all small operators who operate under the contract could reasonably be deemed to have been forced to do so pursuant to the conspiracy.

defendant. Otherwise, the damages could not be deemed to be the "certain result of the wrong" as required by the U. S. Supreme Court in *Story Parchment Co. v. Paterson Parchment Co., supra.* As relates to this particular plaintiff, the sole "wrong" could only have been found to be the requirement that plaintiff enter into the UMW contract as a condition for receiving the coal land leases. That same "wrong" could just as easily have led to millions in profits, measured by plaintiff's own evidence, had not plaintiff unilaterally chosen to execute the Southern Labor Union contract. There is no evidence upon which the jury could have found or reasonably inferred otherwise.

### IV

The court is unable to discern any prejudicial error in either its rulings on admission of proffered evidence or in the instructions given to the jury. Defendant's motion for a new trial is denied. However, the court is constrained to conclude that there is absolutely no evidence of record upon which the jury could have reasonably found that the damages sustained by plaintiff were in any way caused by actions of defendant taken pursuant to an illegal conspiracy. Accordingly, defendant's motion for judgment notwithstanding the verdict must be granted. An appropriate order and judgment will be entered this day.